**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| ANTHONY CELLUCI, , PUTATIVE CLASS REPRESENTATIVE AND THOSE SIMILARLY SITUATED,<br><br>                    Plaintiffs,<br>          v.<br><br>MICHAEL MONTALVO<br><br>                    Defendant. | CLASS ACTION COMPLAINT<br><br><br>DEMAND FOR TRIAL BY JURY |

## TABLE OF CONTENTS

I.    OVERVIEW ................................................................................................................5

II.   PROCEDURAL ALLEGATIONS ...................................................................................14

III.  PARTIES .................................................................................................................14

A.    PLAINTIFFS ............................................................................................................14

B.    DEFENDANT ..........................................................................................................14

C.    CERTAIN MDL DEFENDANTS ..................................................................................15

1.    The TelexFree Insiders ...........................................................................................15

2.    The Licensed Professionals .....................................................................................16

3.    Financial Services Providers ....................................................................................17

4.    TelexFree Entities ..................................................................................................20

C.    SETTLED DEFENDANTS ...........................................................................................21

D.    CERTAIN THIRD PARTIES .........................................................................................22

IV.   DETAILED ALLEGATIONS .........................................................................................24

A.    THE TELEXFREE SCHEME ........................................................................................24

B.    THE INSIDERS .........................................................................................................25

1.    Merrill, Wanzeler and Costa Form TelexFree ............................................................25

2.    The Numerous TelexFree Entities Overlapped and Functioned As One ..........................25

3.    TelexFree Relied on Its Home Office Employees To Carry Out Unlawful Acts..................28

C.    TELEXFREE'S PROMISED RETURNS ..........................................................................30

D.    TELEXFREE'S BACK OFFICE ......................................................................................32

E.    TELEXFREE'S MARKETING AND PUBLIC STATEMENTS WERE EASILY DETECTABLE BY THE
DEFENDANTS .................................................................................................................33

F.    BRAZILIAN AUTHORITIES INVESTIGATE AND THEN CLOSE DOWN TELEXFREE BRAZIL IN
2013 ............................................................................................................................35

G.    GOVERNMENTAL INVESTIGATIONS LEAD TO TELEXFREE'S DEMISE ..............................37

H.    ENFORCEMENT ACTIONS BY STATE AND FEDERAL AUTHORITIES ..................................38

I.    THE ROLE OF THE BANKS .........................................................................................42

**1.    Legal Obligations of Banks To Understand And Monitor Their Customers' Business Activities** ....................................................................................................**43**

**2.    The MDL Defendant Banks' "Know Your Client" Protocols Identified TelexFree As A Fraudulent Enterprise** ..............................................................................**46**

**3.    Monitoring** ....................................................................................................**53**

**4.    Money Laundering** .......................................................................................**56**

**J.    THE ROLE OF PAYMENT PROCESSORS** ..........................................................**57**

**1.    How the Payment Processing System Works** ..............................................**59**

**K.    THE ROLE OF THE LICENSED PROFESSIONALS** ..............................................**65**

        **DETAILED ALLEGATIONS REGARDING MICHAEL MONTALVO** .......................**67**

**V.    FRAUDULENT CONCEALMENT** ......................................................................**109**

**CLAIMS FOR RELIEF** ................................................................................................**110**

**FIRST CLAIM FOR RELIEF TORTIOUS AIDING AND ABETTING FRAUD** ....................**110**

**VI.    PRAYER FOR RELIEF** ...................................................................................**111**

**VII.    DEMAND FOR JURY TRIAL** ..........................................................................**112**

Putative Class Representative Anthony Cellucci ("Cellucci") on behalf of himself and all others similarly situated ("Plaintiffs" or "Class Representatives") through their undersigned attorneys, hereby bring this this action against Defendant Michael Montalvo, named herein. The allegations are based on Plaintiffs' personal knowledge as to their own acts, and on information and belief as to all other matters, except for the allegations sounding in fraud, acts supported by documentary evidence, and such information and belief having been informed by the investigation conducted by Plaintiffs' counsel.

Numerous other defendants have been named in a Multi-District Litigation which is pending Federal District Court in Massachusetts, In Re TelexFree,  MDL No. 4:14-md-2566-TSH (hereinafter, "MDL Defendants"). The Fifth Consolidated Amended Complaint for MDL No. 4:14-md-2566-TSH (Doc. 1186) is attached hereto and incorporated by reference.  By way of background, Plaintiffs had originally sought to add Defendant Michael Montalvo into MDL No. 4:14-md-2566-TSH by means of a Motion to Amend (Doc. 983) filed on May 19, 2020.  The Court granted parts of Plaintiffs Motion to Amend by Court Order dated December 6, 2021, (Doc. 1176) but denied Plaintiffs' motion to add Montalvo finding that the Court did not have personal jurisdiction over him. As such, Plaintiffs have filed the instant Complaint in this Court which has personal jurisdiction over the matter.  It is important for this Court to note that prior to the inevitable transfer, this Court must issue summons as the MDL Transferee Court lacks the ability to do so and Plaintiffs must and will perfect service prior to transfer.

Plaintiffs have included background information herein regarding other MDL Defendants and Third Parties for context and ease of reference and also because many of the actions of Defendant Montalvo are intertwined and related with those of other parties.

The evidence supporting this Complaint includes:

(a) review and analysis of documents obtained in October 2019 from the Bankruptcy Trustee in the TelexFree bankruptcy proceedings;

(b) subsequent interviews with TelexFree CPA and CFO Joseph Craft and review and analysis of documents provided by Mr. Craft

(c) review of various newly filed public records associated with TelexFree, its control persons, and its properties including recent SEC guilty pleas; and

(d) expert analysis.

Counsel's investigation into the matters alleged herein is ongoing and many relevant facts continue to be known only to, or remain exclusively within the custody or control of, the Defendants. Despite due diligence, Plaintiffs only received sufficient information to discover claims against Defendant Montalvo, at the earliest with the affidavit of Joseph Craft dated January 22, 2020 and the eventual review of documents received in October 2019.   Prior to this time, Plaintiffs could not have reasonably known of the claims set forth herein against Michael Montalvo.  Prior to this time, Plaintiffs could not have reasonably known of the claims set forth herein against Michael Montalvo.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Discovery in MDL 2566 was stayed during the pendency of criminal prosecutions. Discovery against the new major Defendants newly added in December 2021, including Montalvo's former employer, newly added in December 2021 has yet to commence. No depositions have taken place in MDL 2566. Detailed allegations against Montalvo can be found at paragraph 257.

On behalf of themselves and the class they seek to represent, Plaintiffs alleges:

**I.    OVERVIEW**

1.      This case stems from Montalvo aiding and abetting one of the biggest pyramid and Ponzi schemes in history. TelexFree, Inc., TelexFree LLC, TelexFree Financial, Inc., and their related entities, insiders and associates (collectively "TelexFree") purported to be in the sale of long-distance telephone business. In reality, TelexFree had virtually no income from its purported business. Instead, it sold "memberships" to its unsophisticated victims falsely promising a guaranteed passive return. The resale of the Ad Central membership plans was at the heart of the pyramid scheme.

2.      TelexFree falsely represented that it had developed cutting edge technology. TelexFree targeted vulnerable individuals in immigrant communities who spoke English as a second language, religious communities, and the uneducated, among others. To build trust and expand its market, TelexFree encouraged individual participants to target family members and friends.

3.      Specifically, TelexFree held itself out as a competitor of Skype-like long-distance calling plans. TelexFree sold a monthly unlimited calling plan called 99TelexFree Voice. For $49.90 a month the buyer received unlimited international calling over TelexFree's voice over internet system ("VOIP").

4.      TelexFree held itself out as a multilevel marketing or "MLM" enterprise. In addition to its 99TelexFree Voice product, TelexFree also invited the public to purchase "memberships" which purported to allow an individual to buy and resell 99TelexFree Voice to others.  These were falsely presented as a lucrative business opportunity which would provide guaranteed passive returns.

5.      Membership cost $50. Once a member, an individual could buy two types of packages. For $289, the member received an ADCENTRAL kit which contained ten (10) one-

month 99TelexFree Voice products. For $1,375, members could purchase an ADCENTRAL FAMILY membership kit which was equivalent to five (5) ADCENTRAL packages. TelexFree openly and unlawfully offered its members a guaranteed passive return.

6.      While each one-month subscription was ostensibly for resale, members were not required to sell them to receive a return. For example, if the member who purchased an individual ADCENTRAL kit posted one copy of an advertisement provided by TelexFree on the internet each day for one week, TelexFree would "buy back" any unsold VOIP plan for $20. The work required to post the ads was minimal – it could be accomplished in a few minutes – and each ADCENTRAL kit allowed a member to do this for one year.

7.      If a member who purchased an ADCENTRAL FAMILY kit posted five advertisements per day for one week, TelexFree would "buy back" any unsold VOIP plans for $100. Thus, as TelexFree emphasized on its website, in its promotional materials, and at its "extravaganzas" held around the world, members were guaranteed a return on their investment of over 200% even if they never sold a single one-month subscription of 99TelexFree Voice. TelexFree's website assured its unsophisticated victims that they were guaranteed to make money even if they never sold TelexFree's VOIP product. The website announced:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US $299 (annually).
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) TelexFree.
> This will be for the 52 weeks of the year, of your contract, then see the situation:
> 52 weeks x $20 (Putting the 7 announcements) = $1,040 in the year.

8.      This is what TelexFree's victims signed up for. A member could buy as many of these packages as they wanted and were encouraged to do so by TelexFree.

9.     In fact, however, contrary to TelexFree's false descriptions of its business as a telecommunications company, virtually all of its revenue came from the sales of ADCENTRAL and ADCENTRAL FAMILY memberships – not the sale of telephone services. For example, according to the Massachusetts Secretary of the Commonwealth ("SOC"), in 2012 and 2013, TelexFree had 783,771 investments of either $289.00 or $1,375.00 totaling $880,189,455.32. During the same period the SOC could identify less than one percent (1%) of TelexFree's total income as sales of VOIP.

10.     To a professional banker, or other financial professional, TelexFree's business model had the classic hallmarks of both a Ponzi scheme and a pyramid scheme.  In a Ponzi scheme, a business fraudulently persuades victims to invest money in a seemingly legitimate business, often by guaranteeing a return on investment. In reality, the business has no or negligible legitimate operations and provides few or no actual products or services. A pyramid scheme is a variation on a Ponzi scheme. In a pyramid scheme, a participant makes a payment to a multilevel marketing ("MLM") company in return for the right to sell a product and the right to receive rewards for recruiting other participants with little or no relation to the sale of the product to end users. Each new group of recruits forms a tier in a pyramid, hence the name "pyramid scheme."

11.     In each type of scheme, the fraudsters promise to pay – and do pay some – returns and/or commissions to the earlier investors to bring in new investors/participants to ensure a continual flow of new funds. Continual expansion is essential because the business has no meaningful legitimate operations and, therefore, no legitimate income to use to fulfill its promises of payment to its participants. Massive continuing and ever-growing new investment is essential to prolong the scheme. Inevitably, however, the influx of new investments and participants stops or slows such that the promised returns cannot be paid and the scheme collapses. This happened

to TelexFree in mid-April 2014.

12.     TelexFree operated its unlawful scheme in many countries around the world, including Brazil, Peru, Rwanda, the United Kingdom, Canada, and Haiti, among other places. It operated in the United States from 2012 and through mid- April 2014. During this time, Carlos Wanzeler, James Merrill and the other TelexFree fraudsters swindled well over 700,000 victims, taking them for over $1 billion.   TelexFree's operations were headquartered in Marlborough, Massachusetts and a substantial part of the illicit funds obtained by TelexFree worldwide passed through bank accounts in the United States.

13.     The services of banks, payment processors, lawyers, accountants and other professionals are essential to the operation of pyramid/Ponzi schemes because they generate huge sums of illicit cash.  For the crooked insiders to achieve their goal -- to abscond with large amounts of their victims' money -- the cash needs to be collected, consolidated in bank accounts, and then siphoned off and laundered to hide its illegal origin. In addition, to prolong the enterprise before its inevitable collapse, pyramid/Ponzi schemes need to pay participants some amount of their promised returns so that the fraud is not exposed, and they need financial providers to do this.

14.     As detailed below financial service providers also provide the only means of making the source of illegal money as difficult to detect as possible by progressively adding transactional complexity and legitimacy to the equation. Depending on the nature, timing and landing place of the victim funds, this process is alternatively defined as layering, laundering or sheltering.  Finally, financial service providers also provide the only means for financial scamsters to move victim funds out of the reach of the justice system, most often into an offshore account. This is called sheltering.

15.     Banking and anti-money laundering regulations make clear that the definition of

routine banking excludes all activity after a financial institution obtains actual knowledge that the customer is operating an unlawful enterprise

16.     Every Ponzi or pyramid scheme depends on the provision of financial services by banks, payment processors and other financial services companies, as well as accountants, lawyers and other professionals.

17.     TelexFree was no different. During its operation, it collected and deposited enormous amounts of money – over one billion dollars. Cash receipts averaged $6.4 million a month in spring 2013 and increased to $66 million a month in the spring of 2014. Without these financial services, TelexFree's operations would have collapsed. The assistance provided by the Defendant Banks, Payment Processors and other professionals allowed TelexFree to continue to operate and expand and allowed TelexFree's principals to abscond with large sums of money paid in by participants. These Defendants were aware that TelexFree was a fraudulent enterprise when they provided this assistance.

18.     The Defendant Banks, among other things, provided essential bank accounts and other services that the TelexFree insiders used to collect and abscond with massive amounts of money from their victims. The Banks did so knowing that TelexFree was a fraud. Each Defendant Bank learned of the TelexFree fraud because they were legally required to investigate and monitor their clients. The fact that each closed TelexFree accounts confirmed their knowledge. Decisively, each Defendant Bank continued after such closures to provide other accounts and services enabling TelexFree's unlawful MLM to continue. As a result, TelexFree continued to use the Banks to fraudulently collect huge sums of money from their victims, and to launder and abscond with it.

19.     The payment processors likewise used their systems to collect enormous sums from TelexFree's victims via credit card payments and facilitated their deposit into the TelexFree bank

accounts, among other things.

20.    The lawyers, accountants and other professionals facilitated the fraud advising the TelexFree insiders on the means to avoid the attention and oversight of regulatory authorities and law enforcement by creating an illusion of legitimacy for the TelexFree operations and by instructing TelexFree how to shelter its ill-gotten gains.

21.    No later than February 2013, the fact that TelexFree was investigated by numerous law enforcement bodies around the world, including the Brazilian Bureau of Consumer Protection ("ProCon") in Acre, Brazil and the Massachusetts Securities Division was known to its financial services providers. ProCon effectively shut down TelexFree's operations in Brazil in June 2013.

22.    It is not disputed that during the Spring of 2013:

    a.   a Brazilian court found TelexFree's Brazilian operations to be fraudulent;

    b.   a Brazilian court described TelexFree's operations in terms of the quintessential pyramid scheme;

    c.    TelexFree's own Brazilian lawyers unwittingly admitted its operations in what was a quintessential pyramid scheme;

    d.   TelexFree's Brazilian lawyer Djacir Falcão ("Falcão") advised the Brazilian court that an injunction would cause the company to enter bankruptcy and: "Running the company really becomes difficult because of the court decision, so we will appeal";

    e.   Falcão informed the Brazilian court that "should the company spend a few more days being prohibited from signing up new investors, they would have no money to pay the old ones";

    f.   all of TelexFree's appeals in the Brazilian courts were denied;

g.  a Brazilian court found that the problem is earnings will be exhausted when the main source of revenue—new member registrations—stops;

h.  a Brazilian court found that adding new Members was more important to TelexFree than trying to sell its VoIP product;

i.  a Brazilian court found that many affiliates suffered detrimental losses. affiliates do not have the opportunity to recover their initial payment to TelexFree; and

j.  In June 2013, Brazilian court entered an order freezing TelexFree's funds in Brazil, blocking future payments to TelexFree in Brazil, and enjoining TelexFree from signing on new members in Brazil.

23.    It is also not disputed that:

a.  TelexFree required the constant inflow of new investor funds to sustain the pyramid side of its overall scheme;

b.  TelexFree's revenues were generated from website-based purchases;

c.  TelexFree's use of credit cards was inextricably linked to TelexFree's ability to operate.

d.  TelexFree would collapse within months without access to financial services, including banking and payment processing.

e.  TelexFree met this need by committing fraud on the victim Putative Class members;

24.    It cannot be disputed that:

a.  TelexFree's banks and payment processors were severing ties with the company by August 2013;

    b.   as a result, TelexFree was experiencing significant difficulty locating U.S. banks and payment processors willing to service their "business";

    c.   Bank of America had severed ties but then immediately reopened new accounts using an unlawful method the industry refers to as layering.

25.    The constant need for new funds – and the unparalleled success bilking members of the Putative Class - drove TelexFree and its co-conspirators, accomplices, aiders and abettors to work with each other to ever increase TelexFree's victim-funded revenue stream.

26.    As detailed below, thereafter the fact that TelexFree was operating an unlawful MLM came to the attention of the financial service providers thereafter again and again in ever increasingly clear, direct, and incontrovertible ways.

27.    As the governmental investigations and publicity about them intensified, TelexFree collapsed. On April 14, 2014, three TelexFree entities—TelexFree Inc., TelexFree LLC, and TelexFree Financial LLC—filed for Chapter 11 bankruptcy protections in the United States Bankruptcy Court for the District of Nevada. The company's U.S. website was taken down the same day, preventing participants from accessing funds held in TelexFree's systems.

28.    The next day, on April 15, 2014, federal agents from the FBI and Homeland Security executed search warrants at TelexFree headquarters in Marlborough, Massachusetts. During the search, an officer intercepted Settled Defendant Joseph H. Craft—TelexFree's CFO—trying to leave the premises. Craft was carrying ten cashier's checks issued by Defendant Wells Fargo Bank totaling $37,948,296 dated just prior to the bankruptcy filing.

29.    The same day, the U.S. Securities and Exchange Commission and the Massachusetts Securities Division filed actions against TelexFree and its insiders. On July 23, 2014, Wanzeler and Merrill were indicted by the Grand Jury. James Merrill eventually pled guilty

on October 22, 2016 to one count of wire fraud conspiracy and eight counts of wire fraud. Merrill was sentenced on March 22, 2017 to six years in prison followed by three years of supervised release. He remains in prison. Merrill also agreed to forfeit approximately $140 million and other assets. Carlos Wanzeler fled to Brazil upon learning that he was under investigation and remains a fugitive. There is currently a federal warrant for his arrest.

30.     Defendant Michael Montalvo, through his position at Wells Fargo Bank and in tandem with other MDL Defendants, like many of the other defendants named in the MDL, aided and abetted TelexFree its principals and agents by providing substantial assistance all the while with knowledge of its fraudulent nature.

## II.     PROCEDURAL ALLEGATIONS

31.     This Court has subject-matter jurisdiction over the instant matter pursuant to 28 U.S.C. § 1332(d) and the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §§ 1711, *et seq*., which vest original jurisdiction in the district courts of the United States for any multi-state class action where the aggregate amount in controversy exceeds $5,000,000 and where the citizenship of any member of the class of plaintiffs is different from that of any defendant.  The $5,000,000 amount-in-controversy and diverse citizenship requirements of CAFA are satisfied in this case.

32.     Venue is proper under 28 U.S.C. § 1391 since a substantial part of the acts, omissions and transactions giving rise to this action occurred in this district and Defendant resides in this district.

## III.     PARTIES

A.     **PLAINTIFFS**

33.     Plaintiff Anthony Cellucci ("Cellucci") is an individual who resides in Belmont,

Massachusetts. Cellucci tendered funds for a TelexFree Membership and its promised pre-March 9, 2014 return on investment.

**B.      DEFENDANT**

34.      Michael Montalvo is an individual with a last known place of abode located at 2859 Spring Heather Place, Oviedo, Florida 32766-6618. At all material times, Montalvo was a Vice President and Wealth Advisor with Wells Fargo Bank. Montalvo was actively involved in the TelexFree account and served as a banker for TelexFree in coordination with Wells Fargo Advisors' Mauricio Cardenas. Upon information and belief, Montalvo was also employed by Wells Fargo Advisors, LLC.

**C.      CERTAIN MDL DEFENDANTS**

**1.      The TelexFree Insiders**

35.      James M. Merrill ("Merrill") is an individual and is currently incarcerated at FMC Devens in Devens, Massachusetts for his role in TelexFree.  Merrill co-founded TelexFree and served as CEO and held multiple other executive titles and filled across the board roles in pyramid scheme design, marketing, management sales and finance.

36.      Carlos N. Wanzeler ("Wanzeler") is an individual with a last known usual place of abode of 373 Howard Street, Northborough, Massachusetts. Wanzeler cofounded TelexFree and held multiple executive titles and served across the board roles in pyramid scheme design, marketing, management, sales, and financing. Wanzeler is currently a fugitive after absconding to Brazil during federal and state investigations into TelexFree.

37.      Carlos Roberto Costa ("Costa") is an individual with a last known usual place of abode,  Rua Umbizeiro, 37, Bairro de Itapoa, Vila Velha, Espirito Santo, 29101-00 Brazil. Costa co-founded TelexFree and ran the Brazilian side of the scheme.

38.    Steven M. Labriola ("Labriola") is an individual with a last known usual place of abode of 21 Kiwanis Beach Road, Upton, Massachusetts 01568. As the International Marketing Director, Labriola was the day-to-day face of the company for many Promoters as he participated in marketing events and conference calls.

39.    Andreia B. Moreira, also known as Andreia Moreira Biachi, also known as Andreia Pinto ("Moreira"), is an individual having a last known usual place of abode of 216 W. Union Street, Ashland, Massachusetts 01721. Moreira filled across the board roles in marketing, management, sales, and finance.

40.    Ana Paula Oliveira ("Oliveira"), is an individual having a last known usual place of abode of 40 Harvard Street, Apt 2, Marlborough, Massachusetts 01752. Oliveira filled across the board roles in marketing, management, sales, and finance.

41.    Moreira and Oliveira worked at TelexFree's Marlborough Office and were also responsible for implementing the day-to-day activities of the company. For example, they sent wire transfers, addressed Promoter questions and complaints, and interacted with TelexFree's financial services contacts.

42.    Katia Wanzeler is an individual with a last known usual place of abode of 373 Howard Street, Northborough, Massachusetts 01532. Katia Wanzeler is the wife of Carlos Wanzeler and actively assisted her husband in fraudulently stealing and laundering funds that were derived from the TelexFree Pyramid Scheme. On or about May 14, 2014, Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

2.    **The Licensed Professionals**

a.    ***The Lawyer Defendants***

43.    Garvey Schubert Barer, P.C. was a Professional Corporation duly organized and

existing under the laws of the State of Washington at the time of the actions alleged in this complaint. In 2019, the law firm Foster Garvey P.C. was formed through the combination of Garvey Schubert Barer, P.C. and Foster Pepper PLLC. Foster Garvey P.C. is a Professional Service Corporation duly organized and existing under the laws of the State of Washington, with its principal office located at 1111 3rd Avenue, Suite 3000, Seattle, Washington 98101.

44.     Robert Weaver ("Weaver") is an individual having a last known usual place of abode of 2210 NE Thompson Street, Portland, OR 97212. Weaver was the first attorney at Garvey Schubert Barer emailed by Babener when it became clear that TelexFree needed further legal assistance. Weaver represented TelexFree in criminal defense matters and was particularly involved in preparing TelexFree's defense and submission of false and misleading evidence to the Massachusetts Securities Division. Weaver is an attorney duly licensed to practice law in the State of Oregon.

45.     Samuel C. Kauffman ("Kauffman") is an individual having a last known usual place of abode of 112 SW Abernathy Street, Portland, OR 97279. Kauffman was part of Garvey Schubert Barer's TelexFree team and represented TelexFree in criminal defense matters, particularly in late 2013. Kauffman is an attorney duly licensed to practice law in the State of Oregon.

46.     Gary P. Tober ("Tober") is an individual having a last known usual place of abode of 12028 200th CT NE, Woodinville, WA 98077. Tober was part of Garvey Schubert Barer's TelexFree team and represented TelexFree in its international restructuring and worked on plans to move TelexFree's assets—victim's funds—offshore. Tober is an attorney duly licensed to practice law in the States of Washington and Ohio.

47.     Sara P. Sandford ("Sandford") is an individual having a last known usual place of abode of 9416 Tulalip Shores Road, Tulalip, WA 98271. Sandford was part of Garvey Schubert

Barer's TelexFree team and represented TelexFree in its international restructuring and designed and saw through TelexFree's sheltering of victim's funds offshore. Sandford was the lead in forming TelexFree's Grand Cayman entity. Sandford is an attorney duly licensed to practice law in the States of California, Oregon and Washington and Ohio.

### 3. Financial Services Providers

#### a. The Bank Defendants

48.    Wells Fargo Bank, N.A. ("Wells Fargo") is a national banking institution chartered and supervised by the OCC, with an address at P.O. Box 6995, Portland, Oregon 97228 and a branch at 800 North Magnolia Ave., Orlando, Florida. Wells Fargo conducts business in the Commonwealth of Massachusetts at, *inter alia*, 201 Washington Street, Boston, Massachusetts. Wells Fargo provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree from no later than June 2012 to April 2014.

49.    Wells Fargo Advisors, LLC ("Wells Fargo Advisors"), at all relevant times, is a limited liability corporation duly organized and existing under the laws of the State of Delaware and having its principal place of business at One North Jefferson Avenue, St. Louis, Missouri 63103. Upon information and belief, in November 2016, Wells Fargo Advisors, LLC's name was changed to Wells Fargo Clearing Services, LLC. Upon further information and belief and representations of counsel, Wells Fargo Advisors, LLC is now known as Wells Fargo Financial Network, LLC.

50.    Mauricio Cardenas ("Cardenas") is an individual having a last known usual place of abode of 12880 Lower River Blvd. Orlando, Florida 32828. During the class period, Cardenas was a Financial Advisor and broker for Wells Fargo Advisors. Cardenas was a close friend of Carlos Wanzeler, advised him how to launder TelexFree's money, and opened multiple accounts for Wanzeler and TelexFree.

### b.    *Payment Processing Service Companies*

51.    International Payout Systems, Inc. ("IPS"), also doing business as i-Payout, is a corporation duly organized and existing under the laws of the State of Florida, having its principal offices at 540 NE 4th Street, Second Floor, Fort Lauderdale, Florida 33301. IPS provided payment processing services to TelexFree from at least September of 2013 to at least April of 2013, processing over $101 million in a four (4) month period.

52.    ProPay, Inc. ("ProPay"), also doing business as PROPAY.COM, is a corporation duly organized and existing under the laws of the State of Utah with its principal offices at 3400 North Ashton Boulevard, Lehi, Utah 84043. ProPay provided payment processing services to TelexFree from at least October 2012 to at least January 2014, processing approximately $112 million in a six (6) month period.

53.    Vantage Payments, LLC ("Vantage Payments") is a limited liability company duly organized and existing under the laws of the State of Arizona, having its principal offices at 8300 N. Hayden Road #A207, Scottsdale, Arizona 85251. Vantage Payments provided payment processing related services to TelexFree from at least August 2013 to at least April 2014.

54.    Dustin Sparman ("Sparman") is an individual with a last known usual place of abode of 8702 E. Plaza Avenue 85610, Scottsdale, Arizona 85250. served as Vantage Payments' Managing Partner during the class period and assisted TelexFree with obtaining payment processing services and establishing TelexFree, Ltd.

55.    AlliedWallet, Inc., also d/b/a Allied Wallet ("Allied Inc.") (collectively with Allied Wallet, Ltd. , "Allied Wallet") is a Nevada corporation with a registered agent address of 769 Basque Way, Suite 300, Carson City, Nevada, and has maintained a principal place of business at 9000 Sunset Boulevard, Suite 820, West Hollywood, California.

56.    Allied Wallet, Ltd. is a limited company having its central office in the United

Kingdom and its United States office at 900 Sunset Boulevard, Suite 820, West Hollywood, California 90069.

57.    Allied Wallet provided payment processing services to TelexFree from at least August 2013 to at least April of 2014, processing approximately $86 million for TelexFree in a five (5) month period.

58.    Ahmad Khawaja ("Khawaja"), also known as Andy Khawaja, is an individual having a last known usual place of abode of 1800 Rising Glen Road, West Hollywood, CA 90069. Khawaja is the founder, CEO, director, and owner of Allied Wallet.

59.    In or about April 2019, AlliedWallet, Inc. Allied Wallet, Ltd., and Khawaja, along with two other entities, agreed to pay $110,050,941 to settle an action brought by the FTC concerning Allied Wallet's payment processing activity for high risk clients, including TelexFree (the "FTC Action").

60.    Bank Card Consultants, Inc. ("Bank Card Consultants") is a corporation duly organized and existing under the laws of the State of California, with its principal offices at 23461 S Pointe Drive, Suite 350, Laguna Hills, California 92618. Bank Card Consultants provided payment processing services to TelexFree from at least September 2013 to at least December 2013.

61.    Priority Payout, Corp. ("Priority Payout") is a corporation duly organized and existing under the laws of the State of Florida, having its principal place of business at 60 SW Hideaway Place, Stuart, Florida 34994. Priority Payout provided payment processing services to TelexFree from at least January 2014 to at least April 2014.

62.    Thomas A. Wells ("Wells") is an individual with a last known place of abode located at 300 NE Town Terrace, Jensen Beach, Florida 34957. At all material times, Wells served

as CEO and authorized representative of Priority Payout. Wells was actively involved in the TelexFree account and assisted TelexFree with payment processing services.

### 4. TelexFree Entities

63.     TelexElectric, LLLP ("TelexElectric") is a limited liability limited partnership organized under the laws of the State of Nevada. Its registered agent is BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169. TelexElectric received funds totaling $2,022,329 from TelexFree Inc. and TelexFree LLC.

64.     Telex Mobile, Holdings, Inc. ("Mobile") is a corporation organized and existing under the laws of the State of Nevada, and having its registered agent as BWFC Processing Center, LLC, 3960 Howard Hughes Parkway, Suite 500, Las Vegas, Nevada 89169. Mobile received funds totaling $500,870 from TelexFree Inc. and TelexFree LLC.

## C.     SETTLED DEFENDANTS

65.     The Settled Defendants are included because they are necessary to put facts into context and to provide background for the larger conspiracy.

66.     Joseph H. Craft, also known as Joe H. Craft ("Craft") is an individual with a last known usual place of abode at 825 E. Main Street in Boonville, Indiana 47601-1885. Craft is a CPA and privately provided accounting services and financial advice to TelexFree and others before serving as the Chief Financial Officer of TelexFree, Inc. and TelexFree, LLC. Craft was introduced to TelexFree by Nehra in 2012 and stayed involved through to the very end.

67.     Craft Financial Solutions, LLC ("Craft Financial") is a limited-liability company duly organized and existing under the laws of the State of Indiana with a principal place of business located at 825 E. Main Street, Boonville, Indiana, 47601-1885. Settled Defendant Craft is the sole member and manager of Craft Financial. Craft Financial, through Settled Defendant Craft, provided accounting services and financial advice to TelexFree and others.

68.    Fidelity Co-operative Bank, doing business as Fidelity Bank, ("Fidelity Bank") is a Massachusetts Chartered Banking Institution, having its principal offices at 675 Main Street, in Fitchburg, Massachusetts 01420. Fidelity Bank provided banking services, maintained accounts, and received and executed transfers of funds from or for the benefit of TelexFree and its founders from no later than August 2013 to at least February 2014.

69.    John F. Merrill is an individual with a last known usual place of abode of 7 Kinnicutt Road, Worcester, Massachusetts 01602. John F. Merrill is the brother of Defendant Merrill and served as President and Chief Operating Officer of Fidelity Bank during the class period. Mr. Merrill authorized the transfer of millions of dollars from TelexFree's accounts at Fidelity Bank to the personal accounts of Merrill and Wanzeler.

70.    Synovus Bank ("Synovus") is a Georgia Chartered Banking Institution, having its principal offices at 1148 Broadway, in Columbus, Georgia 31901. Synovus served as the Sponsor Bank for Settled Defendant payment processor Base Commerce during the class period.

71.    Base Commerce, LLC ("Base Commerce") formerly known as Phoenix Payments, LLC, is a limited liability company duly organized and existing under the laws of the State of Arizona with its principal offices at 7910 S. Kyrene Road, Suite 106, Tempe, Arizona 85284. Base Commerce provided payment processing services to TelexFree from at least April 2013 to at least December 2013, processing approximately $36 million in a two (2) month period.

72.    John Hughes ("Hughes") is an individual with a last known usual place of abode of 6455 E. Rustic Drive, Mesa, Arizona 85215. Hughes served as Base Commerce's President during the class period and assisted TelexFree with payment processing services.

D.    **CERTAIN THIRD PARTIES**

73.    Third Party TelexFree, Inc. is a corporation organized under the laws of the Commonwealth of Massachusetts having a last known principal place of business at 225 Cedar

Hill Street, Suite 200, Marlborough, Massachusetts 01752 (the "Marlborough Office"). TelexFree, Inc. was dissolved "by court order or by the SOC" on or about June 30, 2017.

74.    Third Party TelexFree, LLC is a limited liability company organized under the laws of Nevada, having a purported place of business at 4705 S. Durango Drive, #100-J51, Las Vegas, Nevada 89147. However, this address is a Post Office Box. TelexFree, LLC in reality operated from the Marlborough Office in Massachusetts. At all material times, TelexFree, LLC was registered with the Corporations Division of the Secretary to the Commonwealth of Massachusetts (Identification Number 001105166). According to the Nevada Secretary of State's website, TelexFree, LLC's status is "revoked."

75.    Third Party TelexFree Financial, Inc. is a corporation organized under the laws of the State of Florida. TelexFree Financial has an "inactive" status per the Florida Secretary of State's website following an administrative "dissolution for annual report" on September 26, 2014. TelexFree Financial's registered principal place of business at 2321 NW 37th Avenue, Coconut Creek, Florida 33063 is a residential property. In reality, TelexFree Financial operated from the Marlborough Office in Massachusetts. TelexFree Financial is a wholly owned subsidiary of TelexFree, LLC.

76.    TelexFree, Inc., TelexFree, LLC, and TelexFree Financial, Inc. are not currently Defendants due to their Chapter 11 bankruptcy protections, but they are third-party participants in the unlawful activities described in this complaint.

77.    Third Party Michael L. Sheffield ("Sheffield" or "Mike Sheffield") is an individual. Sheffield is the founder of Sheffield Group and was recruited to the TelexFree Scheme by Babener and worked on the pre and post March 9, 2014 compensation plan. Together with the lawyers, Sheffield advised TelexFree to keep operating and not to shut down until the business model which

they had concluded was unlawful, was made legal.

78.     Third Party Richard Colabella is an individual. Colabella was recommended to TelexFree by Babener, who had known him for approximately twenty years. Colabella is/was a ranking member of PwC and all of PwC's efforts described below were a result of his efforts.

79.     Third Party Jerry Puzey ("Puzey") is an individual. Puzey is/was a ranking member of PwC and all PWC's efforts described below were a result of his efforts.

80.     Third Party Global Payroll Gateway, Inc. ("GPG") is a corporation duly organized and existing under the laws of the State of California, having its principal offices at 18662 MacArthur Boulevard, Suite 200, in Irvine, California 92612.

81.     Third Party Jayme Amirie ("Amirie") is an indraftCividual. Amirie was GPG's owner and CEO during the class period. Amirie was actively involved in the TelexFree account and assisted TelexFree with payment processing services.

**IV.   DETAILED ALLEGATIONS**

**A.   THE TELEXFREE SCHEME**

82.     TelexFree purported to sell a Voice over Internet Protocol ("VoIP") telephone service called 99TelexFree. VoIP technology allows users to make telephone calls over the Internet, often far cheaper than they can through traditional carriers. Users could download the 99TelexFree product on their computer or (later) their smartphone and then register their phone number with TelexFree. From the registered phone number, the user would call a local access number, the TelexFree system would recognize a call by a registered phone number, and the user would then hear a new dial tone that would allow them to complete their international call. However, TelexFree's purported VoIP product accounted for just 1% of all TelexFree's revenue.

83.     In the hallmark of a Ponzi/pyramid scheme, TelexFree's real source of income—

about 99% of its revenue—was a scheme whereby members were rewarded for bringing in new members. TelexFree's AdCentral program invited people to invest significant sums to join TelexFree and then allowed them to earn money without ever selling TelexFree's VOIP product. The money from new promoters was used, in turn, to pay TelexFree's financial obligations to the existing promoters. TelexFree's entire business depended on this constant influx of money from new promoters to meet its obligations.

84.     TelexFree used a variety of techniques to draw new promoters into its program, including maintaining a website at www.telexfree.com, posting instructional marketing videos to YouTube and other social media sites, and hosting conferences.

## B.     THE INSIDERS

### 1.     Merrill, Wanzeler and Costa Form TelexFree

85.     TelexFree was the brainchild of three men: James M. Merrill, Carlos N. Wanzeler, and Carlos Costa.

86.     Merrill and Wanzeler had known each other since the 1990s and formed Common Cents Communications, Inc. in December 2002 in connection with their work as agents for MLM company, WorldxChange.

87.     In 2007, Wanzeler formed Brazilian Help, Inc. in Massachusetts. Working under the name, "Diskavontade," Merrill and Wanzeler bought their own telecom/VOIP switches and offered a $49.90 calling plan. Diskavontade marketed its VOIP product to the Brazilian community in Massachusetts over local television commercials.

88.     In 2010, Costa established Ympactus Comercial Ltda in the Brazilian state of Acre to sell cosmetics, perfume, and personal hygiene products. Costa was a friend of Wanzeler's and experienced in multi-level marketing.

89.     In 2012, Merrill, Wanzeler and Costa created TelexFree in the same form as a Ponzi

Scheme named Universo Foneclub that was designed and owned by major TelexFree promoter Sanderley Rodrigues de Vasconcelos (aka Sann Rodrigues). Universo Foneclub was registered in the US and targeted the Brazilian community. It was shut down by the U.S. Securities and Exchange Commission in May 2006.

### 2. The Numerous TelexFree Entities Overlapped and Functioned As One

90.    On or about February 15, 2012, Wanzeler and Merrill changed the name of Common Cents Communications to TelexFree, Inc. and caused the website www.telexfree.com to be created. Diskavontade was the registered owner of the TelexFree domain name.

91.    The first page of TelexFree's standard form contract identified the Brazilian corporation "Ympactus Comercial Ltda" (Ympactus"), as its parent and controlling company. Ympactus, was a Brazilian corporation licensed to sell perfume whose license was suspended on June 13, 2013, by order of the court of Acre State for running a Pyramid scheme.

92.    Ympactus and TelexFree had overlapping ownership structures. In 2012, Merrill and Wanzeler became part owners in Ympactus – split Merrill (20%), Wanzeler (30%), and Costa (50%).

93.    Costa became a part owner of TelexFree in the United States until late 2013 and continued to receive funds from TelexFree even after he was no longer officially an owner. Both Merrill and Wanzeler both testified that they transferred at least $3 million to Costa after Brazilian authorities shut down Ympactus' operations.

94.    Costa was an outspoken advocate against the Brazilian Court's decision to enjoin TelexFree's Brazilian activities and appeared in heavily marketed and highly visible YouTube videos promoting TelexFree. In one such video, on June 25, 2013, Costa displayed an insurance notification and represented that it was proof that Promoters' investments would be "protected". In fact, the document was a notification denying coverage. The company, Liberty Seguros

released a note on its website, in response to statements made by TelexFree "Liberty Seguros informs that has no partnership with the company TelexFree." TelexFree heavily marketed other such false representations involving the Best Western Hotels and Google. All of these were noticed by the Defendant Banks automated BSA/ALM systems. (described below)

95.     Within the U.S., TelexFree operated primarily through TelexFree, Inc., a Massachusetts corporation, and TelexFree, LLC, a Nevada limited liability company. Merrill and Wanzeler each owned both companies. Later, on or about December 26, 2013, Craft formed TelexFree Financial Inc., a Florida corporation. On December 30 and December 31, 2013, TelexFree Financial received wire transfers totaling $4,105,000 from TelexFree, Inc. and TelexFree, LLC.

96.     TelexFree's entire unlawful enterprise including its Pyramid scheme and related money laundering and sheltering operated as one entity, sharing staff, resources, transferring funds between entities, and overlapping ownership structures. Everything was run from TelexFree's International Headquarters located in Marlborough, Massachusetts.

97.     In addition to the three core TelexFree entities in the U.S., Merrill, Wanzeler, and Costa created entities to funnel funds away from victims and to gain access to new financial institutions and other opportunities.

98.     For example, Telex Mobile Holdings, Inc. is a Nevada corporation formed on November 26, 2013. Ownership was split between Merrill (approximately 46%) and Wanzeler (approximately 54%). TelexFree, Inc. and TelexFree, LLC made a $500,870 "loan" to Mobile during the class period. Merrill served as President, Secretary and Director while Wanzeler served as Treasurer and Director. Craft was integral in setting up Mobile and Ann Genet served as an advisor and their "person on the ground."

99.    TelexElectric LLLP is a Nevada Limited Liability Limited Partnership that was formed in December 2013. Ownership was split equally between Merrill and Wanzeler. Craft was again involved in setting up the partnership and Ann Genet served as advisor and their "person on the ground." TelexFree, Inc. and TelexFree, LLC made a $2,022,329 "loan" to Electric during the class period.

100.    In September 2012, TelexFree International LLC, a Nevis Limited Liability Company was formed with ownership split between Merrill, Wanzeler, and Costa.  Nevis, an island in the Caribbean, is a known tax haven. On or about September 11, 2012, Wanzeler, Merrill, and Costa were appointed managers of the company.

101.    On or about November 17, 2013, Defendant Babener explained the appeal of TelexFree International's Nevis location:

> From a pr standpoint Nevis sounds like a place that us internationals might base, similar to Herbalife in the caymans and also probably doesn't have pyramid laws and also it probably would not be an issue to omit this tiny place, with 12,000 population, from the marketing program. It is known as an international finance haven, although it has been the subject of black listing among offshore havens… But seems to have been cleared.

102.    On or about June 14, 2013, TelexFree Canada Inc. was incorporated in British Columbia, Canada with ownership split equally between Merrill, Wanzeler, and Costa.

103.    On or about August 28, 2013, TelexFree Ltd. was incorporated under the laws of England and Wales. Wanzeler was the sole Director and Shareholder at incorporation. TelexFree Ltd. was founded for the sole purpose of gaining access to financial services providers based in the UK.

104.    On or about March 6, 2014, Wanzeler, Costa and Merrill created TelexFree International, Ltd., a Grand Cayman corporation. As of March 21, 2014, ownership was split between Wanzeler (35%), Costa (35%), and Merrill (30%).

**3.      TelexFree Relied on Its Home Office Employees To Carry Out Unlawful Acts**

105.      In addition to Merrill, Wanzeler, and Costa, TelexFree relied on a small core group of individuals to drive the scheme and ensure it continued to function.

106.      Defendant Steve Labriola was involved from the very beginning. Labriola met Merrill and Wanzeler through their prior work at WorldxChange and was a Director of Common Cents Communications, Inc. at formation. Labriola stayed with Merrill and Wanzeler at TelexFree as the International Marketing Director. Labriola was the day-to-day face of the company for many Promoters as he participated in marketing events and conference calls.

107.      Settled Defendant Joseph Craft was introduced to TelexFree by one of TelexFree's attorneys, Defendant Nehra. Craft is a CPA and first served as its outside CPA. He later was transitioned by the company to serve as its chief financial officer ("CFO"). Craft stayed involved with TelexFree through to the very end.

108.      Katia Wanzeler is the wife of Carlos Wanzeler and served as an agent, servant, or authorized representative of TelexFree and her husband. Katia Wanzeler actively assisted her husband, Carlos Wanzeler, in fraudulently stealing, sheltering, laundering, and converting victims' funds to their private use. On or about May 14, 2014, Katia Wanzeler was apprehended as she attempted to board a flight to Brazil, on which she had a one-way ticket, cash and seventy pounds of luggage.

109.      Andreia Moreira and Ana-Paula Oliveira worked at TelexFree's Headquarters and were responsible for management, marketing and implementing the day-to-day activities of the company. For example, they sent wire transfers, addressed Promoter questions and complaints, and interacted with TelexFree's financial services contacts and coordinated the acquisition of new financial service providers.

110.      TelexFree's associated individuals that would come up in the BSA/ALM

investigations carried out by the financial service providers, including but not limited to the infamous serial pyramid scheme profiteers Sanderley Rodrigues de Vasconcelos, Santiago de la Rosa, Randy N. Crosby, Scott Miller, Faith R. Sloan, and Daniil Shoyfer were highly visible associated individuals.

### C.    TELEXFREE'S PROMISED RETURNS

111.    TelexFree's compensation plan was convoluted, with multiple levels for entry. TelexFree promised a variety of ways to earn additional compensation.

112.    All users were required to pay a $50 membership fee to TelexFree. After payment of the membership fee, users were provided with a "back office" page on the TelexFree website. The back office page was an electronically accessed account display. Notably, once users paid the membership fee, they tracked their TelexFree purchase and profit online. The system was designed and promoted as being essentially paperless.

113.    Users could then purchase an "ADCENTRAL" package for $289 (for a total cost of $339) or an "ADCENTRAL FAMILY" package for $1,375 (for a total cost of $1,425). With either package, TelexFree purported to give the promoter VOIP packages to sell, although there was no physical product conveyed.

114.    The ADCENTRAL plan gave the promoter access to ten VOIP products to sell each week of the year-long agreement. If the promoter posted one ad for seven consecutive days, TelexFree would "buy back" any unsold stock for $20 and would do so every week. Thus, an investment of $339 resulted in a guaranteed annual return of $1,040 ($20 x 52 weeks), without ever selling the VOIP product, so long as the promoter posted template ads on classified ad websites that were already saturated with TelexFree ads from other promoters. While posting ads required minimal effort, promoters could also pay third parties to post on their behalf.

115.    The ADCENTRAL FAMILY plan gave the promoter access to fifty VOIP products

to sell each week of the year-long agreement. If the promoter posted five ads per day, the company would "buy back" any unsold stock at the end of the seven-day period for $100 and would do so every week. Thus, an investment of $1,425 resulted in a guaranteed annual return of $5,200, regardless of whether they sold the VOIP product.

116.    If the ads did in fact lead to a retail sale, the promoter was promised a 90% commission of the $49.99 paid by the retail customer for the first month of TelexFree's VOIP service. If the retail customer renewed on a monthly basis, the promoter earned an additional 10% commission each time.

117.    TelexFree also offered a variety of recruitment-related bonuses that purported to require promoters to make one retail sale of the VOIP product. But, as TelexFree knew, numerous promoters simply bought the VOIP product themselves, using a different username, and paid the monthly $49.90 cost of the service with credits that they had collected in TelexFree's virtual "back office."

118.    Promoters were paid to recruit other people and then compensated again when their recruits recruited additional people, all without any one level of participants being required to make real retail sales of the VOIP product.

119.    For example, for each direct recruit brought into TelexFree at the ADCENTRAL level, the recruiter received a $20 'fast start' bonus. For each direct recruit brought into TelexFree at the ADCENTRAL FAMILY level, the recruiter received $100. Excluding the purported sale of one VOIP product, promoters received these bonuses without any real retail sales of the VOIP product.

120.    Promoters would also receive an additional $20 or $80 each time they completed a pairing of recruits on the right and left side of their pyramid.

121.    Promoters would also be paid for TelexFree's "buy backs" from promoters they had recruited going six levels deep and they would also profit from actual VOIP sales made by promoters they had recruited.

122.    TelexFree also offered a "Team Builder" bonus. If a promoter made five retail sales of the VOIP product, directly recruited 10 AdCentral Family promoters, and then each of those recruits made five retail sales of the VOIP product, the promoter could earn a maximum bonus of $39,600.

123.    All of this information was available from a review of TelexFree's website and/or its membership contract.

124.    In addition to the AdCentral program, TelexFree's website promoted a fraudulent opportunity to participate in a Best Western hotel investment through a Brazilian affiliate. The Best Western investment opportunity was prominently promoted on the front page of TelexFree's website and guaranteed a yearly annual return of 8%. TelexFree viewed the opportunity as an important marketing tool to bolster TelexFree's credibility worldwide. There was no business relationship between TelexFree and Best Western.

**D.    TELEXFREE'S BACK OFFICE**

125.    With the purchase of an AdCentral or AdCentral Family membership, TelexFree provided a "back office" page on the TelexFree website as a place to manage their sales activities. When promoters earned compensation from TelexFree, it would appear as credits on the promoter's back office page. Once the credits reached a certain balance, promoters could withdraw the credits as cash. Promoters could also use their credits to 'pay' for additional promoter positions or for another person's VOIP service.

126.    The back office system allowed TelexFree to manipulate how its revenue figures were presented. For example, every time a promoter bought a VOIP package with back office

credits, the "sale" was recorded in the back office system as a retail sale of the VOIP product even though, in reality, there was no real customer and the vast majority of the VOIP packages were never used.

E.    **TELEXFREE'S MARKETING AND PUBLIC STATEMENTS WERE EASILY DETECTABLE BY THE DEFENDANTS**

127.    TelexFree was an internet-based business and leveraged its website and social media to draw new promoters into the scheme. TelexFree targeted and marketed to members of the Brazilian and Latin American immigrant communities in Massachusetts, the United States, and around the world.

128.    For example, in or about the summer of 2012, TelexFree's website advertised the fact that promoters could make money without ever selling TelexFree's VOIP product. The website announced:

> Be our promoter
> Earn money doing announcements on Internet!
> Through a ADCENTRAL, that you geot [sic] for the amount of US $299 (annually).
> The promoter will receive US$20 each week that makes 7 different announcements in websites of free announcements online, from Monday to Sunday. All in a way fast, easy, and standardized in your virtual office (BO) TelexFree.
> This will be for the 52 weeks of the year, of your contract, then see the simulation:
> 52 weeks x $20 (Putting the 7 announcements) = $1,040 in the year.

129.    A PowerPoint presentation available to download on TelexFree's website made similar claims, with one version of the presentation announcing: "Earn money the smart way! Without having to invite anyone, without selling anything in the comfort of your own home." The presentation explained the AdCentral program and the opportunity to make $1,040 or $5,200 a year, depending on the level joined.

130.    In addition to their own website, TelexFree's executives and other representatives

used social media sites, including YouTube, to communicate with existing promoters and to reach out to new promoters. TelexFree created recordings specifically for Internet distribution and was also aware that recordings of TelexFree's corporate events were distributed online by others.

131.   For example, on August 19, 2013, a TelexFree Facebook page falsely posted:

"The President of Google involved with Telexfree!!  Google's President will be speaking at our next Telexfree event in Brazil….11 year contract with Best Western 23 Millionaires in 1 year and now Google's President at our Next event. Hmmmm is he coming to your's [sic]?.  Didn't think so….  It's time to get educated.  You get what you pay for!"

132.   TelexFree also used these online resources to mislead existing and potential Promoters about the investigations into TelexFree's Scheme. For example, following the shutdown of TelexFree in Brazil, Merrill, Wanzeler, and other TelexFree executives assured U.S. promoters that there was nothing to worry about.

133.   In a TelexFree conference call, which was posted to YouTube on June 20, 2013, Merrill reassured listeners that there was nothing to worry about, claiming that such inquiries were very common in network marketing and urging Promoters to keep working, asserting "nothing will affect the U.S."

134.   In a January 2014 call with promoters, which was published on YouTube, Labriola stated "there is no investigation . . . in any way, shape or form."

135.   TelexFree also hosted "extravaganzas" where TelexFree's executives would speak directly to promoters. The events happened at various locations around the world with hundreds or thousands of promoters in attendance. Merrill and Wanzeler, along with the other speakers, would promote a lavish, upbeat image of the company and its prospects and seek to build excitement, positioning Merrill as a minor celebrity.

136.   In July 2013, Newport Beach, California became the staging ground for

TelexFree's first United States-based "Extravaganza." The July 2013 TelexFree "Super Weekend" was organized by pyramid scheme Zeek Rewards' high-profile pitchman Thomas More. At the time More organized TelexFree's Newport Beach "Super Weekend" extravaganza, he was a named defendant in a Zeek Rewards Ponzi scheme-related lawsuit.

137.    During the July 2013 TelexFree "Super Weekend," Defendant Nehra gave his "blessing" to TelexFree, representing not only that it was a lawful enterprise and why, but also that he was a duly licensed attorney with extensive specialized skill and experience in MLM.

138.    On November 5 and 6, 2013, TelexFree hosted another "Super Weekend" in Orlando, Florida with tickets costing $196 per person. Merrill dismissed commentary calling TelexFree a pyramid scheme and assured the crowd that they could "trust and believe" in what they were doing:

> I hate to bring up a negative, but it's important. Because negatives get turned into positives. We have plenty of blogs out there that, you know, don't – don't always speak kindly about us, they don't know us. But we know what they're about. They want you guys to go on their website and your competitors will go on their website, drawing traffic that will help them earn a living. I don't blame them. It's business. But what a difference is between you people is trust and belief in what we're doing, and I thank you all for believing in us and helping us get to that next level.

139.    On December 15-16, 2013, TelexFree hosted a sponsored event in Brazil on a cruise ship off the Brazilian coast. Merrill announced that TelexFree was "just getting started." Later, TelexFree offered a DVD of the event for sale that featured Brazil promoters who had become millionaires.

140.    On March 1-2, 2014, a "mega event" was held in Spain.

141.    On or about March 9, 2014, TelexFree hosted a "New Compensation Plan" Conference at the Marriott Copley Place Hotel in Boston, Massachusetts. During this conference, TelexFree executives touted the quality of the VOIP product. Merrill told the crowd, "You're

gonna get paid," and "We are here to help you make money." Wanzeler falsely claimed that in the preceding month, "Over 600,000 customers paid $49.90 to TelexFree99."

## F.    BRAZILIAN AUTHORITIES INVESTIGATE AND THEN CLOSE DOWN TELEXFREE BRAZIL IN 2013

142.    In January 2013, following inquiries from consumers, the Brazilian Bureau of Consumer Protection ("Procon") in Acre announced that it had been investigating TelexFree's Brazilian operations. Procon's press release stated its concern that TelexFree's scheme violated the Brazilian law prohibiting Ponzi/Pyramid schemes and that Procon had notified the State Public Ministry, the Secretariat for Economic Monitoring of the Ministry of Finance and the Federal Police.

143.    According to later filings by the U.S. Department of Justice, as of February 19, 2013, TelexFree's Brazilian bank balances totaled over $200,000,000 and TelexFree bank accounts in Brazil had received approximately $446,000,000 in U.S. dollars during the period they were recruiting promoters in Brazil. Much of this money was transferred to TelexFree's U.S. accounts.

144.    In June 2013, Brazilian authorities won an injunction prohibiting TelexFree from recruiting new promoters and from taking in funds or paying money to existing TelexFree promoters. The injunction essentially closed TelexFree's Brazilian operations.

145.    TelexFree in Brazil released a note on its website explaining the court's decision. The note says as follows (translated from the original Portuguese) and viewed by the banks and pay processors that accepted them as a client was the following splash page on the website

> By judicial decision issued on June 13th, 2013, Judge Thais Queiroz B. de Oliveira Abou Khalil, in the records of the Preparatory Action No. 0005669-76.2013.8.01.0001, filed by the Prosecutor of the Acre State, in the 2nd Civil Court of Rio Branco - AC, new subscriptions to the Telexfree network are prohibited in the Partner or Promoter conditions; receiving of Returnable Deposit Funds and Costs of Reserve Position by Telexfree are forbidden; sales of

99Telexfree VoIP accounts in ADCentral and ADCentral Family modalities are prohibited; payments are prohibited, both to partners and promoters, of commissions, bonuses and any benefits derived from the Telexfree network (from sales of VoIP 99 Telexfree accounts, from new registration, ad postings, forming new direct or indirect binaries, royalty, Team Builder, among others which may be owed); that the breach of any of the above determinations will incur in the payment of a fine of R$ 100,000.00 (one hundred thousand Reais) for each new registration or re-registration and each improper payment.

— *Telexfree Brazil, via a splash page on its website*

## G.    GOVERNMENTAL INVESTIGATIONS LEAD TO TELEXFREE'S DEMISE

146.    The Massachusetts Securities Division ("SOC" or "COMSOC") also started an investigation into TelexFree. On April 4, 2013, the Division issued requests for information to TelexFree, Inc. On or about January 22, 2014 and February 5, 2014, the Massachusetts Securities Division investigation reappeared when TelexFree was served with subpoenas and the Division sought to depose Merrill and Wanzeler. They were deposed on March 25 and 26, 2014.

147.    With the Massachusetts Securities Division investigation looming large, TelexFree's executives and advisors refocused their efforts on making changes to the program, with a view to offering a "more compliant" plan as part of TelexFree's defense strategy.

148.    On March 9, 2014, TelexFree announced changes to its program. The new program purported to impose new requirements on promoters, including requiring participants to sell the VoIP product in order to qualify for the promised payments. These changes were an attempt to portray TelexFree as a legitimate MLM company. They also essentially nullified the promises regarding weekly payments which were the key to TelexFree's sales of its AdCentral and AdCentral Family memberships.

149.    The new program was not well received. Daily revenues dropped from approximately $3,000,000 a day to between $100,000 and $300,000 per day. In the week following the introduction of the [March 9 Plan], members asserted claims for an aggregate of $8 million from their back office accounts, then $20 million the following week, $30 million each of the

following two weeks, and $86 million the week before they went bankrupt.

150.    On April 1, 2014, dozens of members descended upon TelexFree's Marlborough, Massachusetts office to protest this change and attempt to regain access to their money. One protestor was quoted in the press as saying the product was "impossible to sell."

151.    The end came quickly. Little more than a month after announcing its new program, on April 14, 2014, three TelexFree entities—TelexFree Inc., TelexFree LLC, and TelexFree Financial LLC—filed for Chapter 11 bankruptcy protections in the United States Bankruptcy Court for the District of Nevada.

## H.    ENFORCEMENT ACTIONS BY STATE AND FEDERAL AUTHORITIES

152.    The very next day, on April 15, 2014, federal agents from the FBI and Homeland Security executed search warrants, including at TelexFree's headquarters in Marlborough, Massachusetts. During the search, an officer intercepted Settled Defendant Craft trying to leave the premises with a laptop and a bag. While Craft claimed he was a consultant and retrieving personal items, officers found ten Wells Fargo Bank cashiers' checks totaling $37,948,296 in his bag. Eight of the checks were dated April 11, 2014 – the Friday before TelexFree filed for bankruptcy – and were remitted to Merrill. Five of these checks were made out to TelexFree LLC, in the total amount of $25,548,809. One check was made out to Wanzeler's wife in the amount of $2,000,635. One check, dated April 3, 2014, and remitted to Wanzeler himself was made out to TelexFree Dominicana SRL in the amount of $10,398,000.

153.    The same day, the U.S. Securities and Exchange Commission filed charges against TelexFree in the United States District Court seeking an immediate asset freeze which the Court granted.

154.    The same day, April 15, 2014, the Massachusetts Securities Division filed its Administrative Complaint against TelexFree, Inc. and TelexFree LLC alleging violations of the

Massachusetts Uniform Securities Act and related regulations. The complaint alleged that TelexFree raised over $90,000,000 in the Commonwealth and nearly $1,000,000,000 worldwide.

155.    On May 9, 2014, the U.S. Department of Justice filed a criminal complaint against Carlos Wanzeler and James Merrill alleging conspiracy to commit wire fraud. The DOJ estimated that TelexFree's victims worldwide lost $3,045,000,000 when the scheme collapsed. On July 23, 2014, Wanzeler and Merrill were indicted by the Grand Jury and on October 24, 2016, the day his trial was scheduled to begin, James Merrill pled guilty to one count of wire fraud conspiracy and eight counts of wire fraud. Merrill was sentenced to six years in prison followed by three years of supervised release. He remains in prison to this day. Merrill also agreed to forfeit approximately $140 million and other assets. Carlos Wanzeler fled to Brazil upon learning that he was under investigation and remains a fugitive.

156.    On or about May 14, 2014, Katia Wanzeler was arrested on a material witness warrant at JFK International Airport as she attempted to leave the United States. Mrs. Wanzeler was later released after giving up her passports.

157.    On September 22, 2014, the Massachusetts Securities Division entered into a Consent Order with Fidelity Co-Operative Bank resolving issues around Fidelity Bank's involvement with TelexFree. Under the terms of the Consent Order, Fidelity Bank agreed to pay $3,500,000 into a Massachusetts Victim Relief Fund.

158.    On September 16, 2015, TelexFree in Brazil (Ympactus Comercial SA) was ordered to pay 3 million Brazilian reals or over $500,000 U.S. Dollars in damages.

159.    On December 21, 2015, the Bankruptcy Court found that TelexFree LLC, TelexFree Inc., and TelexFree Financial Inc. operated a pyramid and Ponzi scheme and were joint and severally liable for damages.

160.    On May 25, 2017, the SEC settled with Sanderley Rodrigues de Vasconcelos for $1.83 million, including $1.7 million in disgorgement and prejudgment interest and a $150,000 civil penalty. Rodrigues admitted that he was a promoter of TelexFree, appeared at TelexFree-sponsored public events and other gatherings at hotels and resorts. He also admitted that he appeared in promotional videos that were posted to YouTube and that he had posted at least one video himself. Rodrigues was required to transfer certain assets to settle an adversary action filed by the Chapter 11 Trustee. At all times Sanderley Rodrigues was a known associate of TelexFree and one of its top US promoters.

161.    On July 14, 2017, the SEC settled with Steven Labriola. Labriola was ordered to pay $25,000 in disgorgement and prejudgment interest. Labriola admitted that he was responsible for TelexFree's relationships with its promoters, ran numerous training conferences, and that he was one of the main public faces of TelexFree, providing periodic "corporate updates" and appearing in other promotional videos that were posted on YouTube.

162.    On September 12, 2017, the SEC settled with Merrill and Craft. Merrill's final judgment of approximately $3.6 million in disgorgement and prejudgment interest was deemed satisfied by the order of restitution in the criminal case. Craft's final judgment to pay $298,708 in disgorgement and prejudgment interest and a $50,000 penalty was deemed satisfied by an order requiring Craft to transfer certain assets to settle an adversary action in the bankruptcy case. Merrill had previously pled guilty to criminal charges. Craft admitted to preparing financial statements provided to telecommunications regulators, as well as a financial regulator, materially overstating the pyramid scheme's income.

163.    On February 8, 2018, Cleber Rene Rizerio Rocha was sentenced to 33 months in prison and one year of supervised release after he pleaded guilty to one count of conspiring to

commit money laundering and one count of money laundering. After Wanzeler fled the U.S., he

left millions of dollars behind him. Rocha flew from Brazil to New York City in January 2017 as

part of a scheme to help launder Wanzeler's cash out of the United States. DOJ agents followed

Rocha to an apartment in Westborough, Massachusetts where approximately $20 million in cash

was found hidden in a mattress box spring.

164.    On April 27, 2018, the SEC obtained a final judgment against Randy Crosby

ordering him to pay $294,014 in disgorgement by transferring assets to settle an adversary action

filed by the Chapter 11 Trustee and enjoining him from future violations of Section 5 of the

Securities Act of 1933. Crosby admitted that he was a promoter of TelexFree, appearing in

promotional videos that were posted on YouTube and making daily marketing presentations. At

all times Crosby was a known associate of TelexFree and one of its top US promoters.

165.    On August 14, 2018, the SEC settled with Santiago De La Rosa. As a result of the

settlement, De La Rosa was ordered to pay $1,092,013 in disgorgement and prejudgment interest,

which was deemed satisfied by an order requiring De La Rosa to transfer certain assets to settle an

adversary action in the bankruptcy case. On June 4, 2019, the SEC settled with Faith Sloan. Sloan

was ordered to pay $1,271,215 in disgorgement and prejudgment interest and a civil penalty of

$7,500. The payment was deemed partially offset by an order requiring Sloan to transfer certain

assets to settle an adversary action in the bankruptcy action.

166.    At all times relevant De la Rosa and Sloan were highly visible TelexFree marketing

fixtures and highly profitable promoters who appeared at public events to recruit for TelexFree

and in promotional videos that were posted on YouTube. At all times De La Rosa and Sloan were

known associates of TelexFree and among its top US promoters. As explained below, BSA/AML

investigations tied De La Rosa to TelexFree not only during the account opening phase, but also

during the KYC monitoring phase.

167.    On September 28, 2018, the SEC settled with TelexFree, Inc. and TelexFree, LLC. As a result of the settlement the companies were enjoined from future violations of the Securities Laws. The companies both admitted that they were engaged in a Ponzi and pyramid scheme. The SEC also voluntarily dismissed its unjust enrichment claims against TelexFree Financial, Inc.

168.    On November 2, 2018, the SEC obtained default judgments against TelexElectric, LLLP and Telex Mobile Holdings, Inc. TelexElectric was ordered to pay $2,0222,239 and Telex Mobile Holdings was ordered to pay $500,870.

169.    On March 26, 2020, the first in what is expected to be a number of significant awards to the IRS was entered. Specifically, the IRS was granted summary judgment in its claim to be granted an elevated prepetition priority unsecured claim to over $15.5 million of the bankruptcy estate's assets based upon a 2013 erroneous tax refund given to TelexFree. *See In re: TelexFree, LLC*, Case No. 14-40987, Adv. Proc. No. 18-4091, 2020 WL 1659472 (Bankr. D. Mass. Mar. 26, 2020). Some, if not all will be attributed to the aiding and abetting of TelexFree's pyramid scheme by PwC.

I.    **THE ROLE OF THE BANKS**

170.    The MDL Defendant Banks, including Montalvo's employer, Wells Fargo Bank, were knowing and active participants in the TelexFree scheme. Each provided essential assistance to the scheme.

171.    In 2012 through 2014, when the events in this case took place, banks and other financial institutions had (and continue to have) sophisticated systems to identify illegal and suspicious customer conduct and to avoid becoming conduits for illegal financial transactions. Financial institutions implement these systems because they are required by federal anti-money laundering and anti-terrorism laws to do so.  They also function as a loss prevention measure.

172.    Each of the MDL Defendant banks, including Wells Fargo Bank and Wells Fargo Advisors had such systems in place while the TelexFree scheme was operating.   Under these systems, banks and other financial institutions do not sit passively until suspicious behavior is brought to their attention. Rather, they are required to, and do, actively investigate and research each of their customers before opening accounts, and they constantly monitor each transaction of each of their customers while their accounts are active and electronic systems notify specially charged individuals of each transaction that is an anomaly. These notifications are universally referred to in the industry as "red flags" As alleged in more detail below, anomalies that set off red flags include those required by the BSA and the Patriot Act, those set in place by each bank as part of their anti-money laundering protocols or their profit protection restrictions, and transactions that do not fit a Merchants' profile as reflected, *inter alia,* in its banking application. As described below, as a result of both routine banking procedures and the extreme anomalous banking of TelexFree and its associated individuals each Defendant Bank identified TelexFree as a fraudulent enterprise and knowingly provided substantial assistance to the fraud causing great harm to Plaintiffs and the putative class.

1.    **Legal Obligations of Banks To Understand And Monitor Their Customers' Business Activities**

173.    By federal law, every financial institution must observe the bank secrecy and anti-money-laundering requirements of the Bank Secrecy Act (BSA), as amended by the USA PATRIOT Act of 2001. If a bank fails to abide by a banking regulation it not only violates the BSA, Patriot Act and other ALM requirements, it violates its charter, policies and protocols. Services performed in violation of the banking regulations and a bank's own charter and internal policies and protocols fall outside the definition of routine banking services.

174.    After the 9/11 terrorist attacks, Congress increased the depth and scope of customer

surveillance required of financial institutions. Under the USA PATRIOT Act, financial institutions must adopt and employ procedures to detect money laundering and other criminal activities and to prevent being used by customers as conduits for those activities. In addition, financial institutions must file Suspicious Activity Reports (SARs) with federal law enforcement authorities and the Department of the Treasury where they detect known or suspected federal criminal violations involving transactions conducted through the institution.

175.    Federal financial regulators examine financial institutions for BSA and anti-money laundering (AML) compliance and impose sanctions for violations. The obligation to file SARs depends on whether a transaction or transactions is "suspicious." Financial institutions must report, among other things, transactions or patterns of transactions involving or aggregating at least $5,000 or more that the institution either knows, suspects or has reason to suspect are "suspicious" in nature.

176.    Under the federal BSA/AML regulations in effect in 2012 and 2013, a transaction was "suspicious" if the transaction: (1) involved funds derived from illegal activities, or was conducted to disguise funds derived from illegal activities; (2) was designed to evade the reporting or recordkeeping requirements of the BSA or its implementing regulations; or (3) had no business or apparent lawful purpose or was not the sort in which the customer would normally be expected to engage, and the bank knew of no reasonable explanation for the transaction after examining the available facts, including background and possible purpose of the transaction. Importantly, this means that BSA/AML regulatory obligations extend not only to money laundering, but also to otherwise routine banking transactions involving "funds derived from illegal activity," including funds from securities fraud and pyramid or Ponzi schemes.

177.    The Federal Financial Institutions Examination Council (FFIEC) operationalized

the core BSA/AML compliance requirements in its *Bank Secrecy Act/ Anti-Money Laundering Examination Manual* (Money Laundering Manual or Manual). The Money Laundering Manual is a compilation of FFIEC guidance on BSA and AML compliance and financial institutions used and use it "as a valuable resource to evaluate their BSA/AML programs and ensure they align with the regulators' expectations."

178.    The 2010 edition of the Manual was in effect throughout the relevant period of 2012 through spring 2014. As a product of these BSA/AML requirements, during the relevant period, financial institutions had well-established analytics and systems to detect illegal activity by customers. Further, BSA/AML compliance policies defined when individual financial institutions were to terminate customer relationships and freeze account balances once they detected suspicious customer conduct.

179.    According to the Money Laundering Manual, every financial institution had to have a written Customer Identification Program (CIP) that the institution's board of directors approved as part of its BSA/AML compliance program. The purpose of the CIP is to enable the financial institution to form a reasonable belief that it knows the true identity of each customer and understands the intended uses of the banking accounts or other services the customer will utilize. For businesses, this requires that the Bank have a detailed understanding of the customer's business. The CIP also states when an institution should decline to open an account, and when it should close an account. Together, the CIP and the procedures it establishes are popularly known as the "Know Your Customer" or "KYC" protocols.

180.    The FFIEC Manual made clear that all levels of the company had to comply with the BSA/AML requirements, including those set forth in the Manual, from the boardroom and the executive suite to branch employees. The board of directors of every financial institution were

required to ensure that the CIP and its anti-money laundering and BSA protocols were observed throughout the company.

181.    Financial institutions had to "provide training for all personnel whose duties require[d] knowledge of the BSA" and train new staff on BSA/AML requirements.    Each institution's BSA/AML training program had to "ensure that all employees under[stood] their role in maintaining an effective BSA/AML compliance program."

### 2.    The MDL Defendant Banks' "Know Your Client" Protocols Identified TelexFree As A Fraudulent Enterprise

182.    When new customers applied to open bank accounts, financial institutions had a duty to evaluate them for warning signs of suspicious behavior. For entities like TelexFree, this Know Your Customer investigation required establishing the identity of the company and its principals, review of the entity's business including documentary evidence, and review of publicly available information about the entity. It also required classifying all new customers as lower- or higher-risk. The risk classification affected how much due diligence a financial institution undertook for any given customer. Higher-risk customers underwent closer scrutiny, known as "enhanced due diligence" or "EDD."

183.    Enhanced due diligence for higher-risk customers was "especially critical in understanding their anticipated transactions and implementing a suspicious activity monitoring system that reduce[d] the bank's reputation, compliance, and transaction risks."    Higher-risk customers and their transactions, FFIEC explained, were "reviewed more closely at account opening and more frequently throughout the term of their relationship with the bank." According to FFIEC, a customer could be higher-risk "because of the customer's business activity, ownership structure, anticipated or actual volume and types of transactions, including those transactions involving higher-risk jurisdictions."

184.    TelexFree's business activities and business model instantly flagged it as a higher-risk customer for two reasons. First, TelexFree held itself out as a passive income scheme requiring no actual sales or products or services, raising immediate and obvious concerns as to a possible Ponzi scheme. Federal banking regulators had emphasized that MLMs are higher-risk by imposing sanctions for Bank Secrecy Act violations involving customers that later turned out to be Ponzi schemes. Second, TelexFree qualified as higher-risk *per se* because it guaranteed its participants an investment return (in TelexFree's case, of at least 200 percent).

185.    A customer's risk classification was determined through the due diligence process, which involved several steps. First, a financial institution had to form a reasonable belief as to a customer's true identity within a reasonable period of time after opening the account. This required, at a minimum, obtaining the customer's name, date of birth (for individuals), address, and identification number. For business entities, banks typically obtained documents evidencing the legal existence of the entity, such as certified articles of incorporation, an unexpired government-issued business license, a partnership agreement, or a trust instrument.

186.    In addition, for higher-risk customers that were not individuals, financial institutions typically collected information about individuals with authority or control over their accounts, including signatories. The enhanced due diligence for higher-risk customers included steps "to identify and verify beneficial owners . . . and to reasonably understand the relationship between the customer and the beneficial owner."

187.    Due diligence also entailed becoming familiar with a customer's business model and operations. The Manual stated that "the bank should obtain information at account opening sufficient to develop an understanding of normal and expected activity for the customer's occupation or business operations."

188.    For higher-risk customers such as TelexFree, the Manual directed financial institutions to collect in-depth information, including:

    a.  Purpose of the account;

    b.  Source of funds and wealth;

    c.  Individuals with ownership or control over the account, such as beneficial owners, signatories, or guarantors;

    d.  Occupation or type of business (of customer or other individuals with ownership or control over the account);

    e.  Financial statements;

    f.  Banking references;

    g.  Domicile (where the business is organized);

    h.  Proximity of the customer's residence, place of employment, or place of business to the bank;

    i.  Description of the customer's primary trade area and whether international transactions are expected to be routine;

    j.  Description of the business operations, the anticipated volume of currency and total sales, and a list of major customers and suppliers; and

    k.  Explanations for changes in account activity.

189.    To verify this information, FFIEC expected financial institutions to research the customer's operations through information-reporting agencies, banking references, correspondence and telephone conversations with the customer, and visits to the customer's place of business. In addition, FFIEC recommended "researching public information (e.g., on the Internet or commercial databases)," such as through Google searches.

190.    The MDL Defendant Banks including Wells Fargo Advisors and Wells Fargo Bank did discover as a result of their Know Your Customer investigations at the outset of their relationships that TelexFree was a fraudulent pyramid/Ponzi scheme, as set forth in more detail below. While each Defendant Bank's circumstances vary, each Bank became aware that TelexFree was a fraud for at least three general reasons.

191.    First, as noted above, because TelexFree held itself out as a Multi-Level Marketing business it would have been and was immediately identified by the Defendant Banks as a high-risk customer.

192.    Second, examination of TelexFree's business model disclosed that it was also a passive investment scheme promising guaranteed returns to its members of over 200%. This is evident in TelexFree's marketing materials.

193.    Third, examination of TelexFree's Promoter Compensation Contract reveals that it blatantly violated Massachusetts Law.  Specifically, at all times material herein, TelexFree was a "multi-level distribution company" as defined by M.G.L., Chapter 93, Section 69(a).

194.    M.G.L., Chapter 93, Section 69(d)(2) prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein "solely for the solicitation or recruitment of other participants."

195.    The TelexFree Pre-March 9 Contract, on its face, contains numerous instances of promising payment merely for recruitment of new Participants as defined by M.G.L., Chapter 93, Section 69, including, but not limited to, the following:

> Clause 5.7:  "A PROMOTER will achieve TEAM BUILDER status when he is active in an ADCentral FAMILY position (in the marketing network) that has 10 (ten) ADCentral FAMILIES on the incentive plan registered directly by him on his site."

49

Clause 5.7.1:  "As long as he is fulfilling the qualification in clause 5.9.2[1] [sic], a TEAM BUILDER will earn a payment of 2% (two percent) of the company's net billing in the following month…the maximum amount for this earning, by contract, which is for one year, is up to US$ 39,600.00…"

Clause 5.8:  "THE PROMOTER shall receive as an incentive a bonus of US$ 20.00 (twenty U.S. dollars), for each VOIP ADCentral kit that his direct lower PARTNER acquires and a US$ 100.00 (one hundred U.S. dollars) bonus for each VOIP FAMILY kit that his direct lower PARTNER acquires."

Clause 6.1:  "A PROMOTER who directly registers 2 (two) new promoters, with one on the left side and the other on the right side of his marketing network, qualifies for direct and indirect binary earnings, and for 2% (two percent) of the network from the first to the 6th level, assessed only on plans whose owners have at least one active VOIP client, that is, who have at least one active 99TELEXFREE plan."

Clause 6.1.1:  Upon qualifying in the manner described in the clause above by selling 2 (two) new ADCENTRAL kits to people in his network, with 1 (one) on the left side and the other on the right side, he shall receive an additional gratuity of US$20 (twenty U.S. dollars), called the binary cycle, with the maximum daily earning in this status being US$ 440.00 (four hundred and forty U.S. dollars), for 22 (twenty-two) binary cycles.

Clause 6.1.2:  If the sale is of 2 (two) VOIP ADCentral FAMILY kits, this cycle will yield an additional US$ 20.00 (twenty U.S. dollars), for the ADCentral principals, plus US$ 60 (sixty U.S. dollars), for 3 (three) of the 4 (four) ADCentral additional…"

Clause 8.1:  "THE PROMOTER shall be entitled to a payment of 1% (one percent), in the form of ROYALTIES, from the company's net billing, if within 1 (one) calendar month (from the 1st (first) day – to the last day of the month) the PROMOTER shall have closed 22 (twenty-two) cycles in 20 (twenty) days, which need not necessarily be consecutive days."

196.    The above provisions of the standard TelexFree Pre-March 9 Contract are clear and direct violations of M.G.L. c. 93, § 69(d), as they promise payments, including cash payments, "bonuses," "gratuities," "royalties," and dividends, merely for the recruitment of new TelexFree members/participants (i.e. through the sale of AdCentral membership accounts).

---

[1] The TelexFree Pre-March 9 Contract does not include a clause numbered 5.9.2.

197.    Furthermore, M.G.L. Chapter 93, Section 69(d)(3)-(4) also prohibits any multi-level distribution company from offering or paying any "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to any participant therein:

    a.   "unless such participant performs a bona fide and essential supervisory, distributive, selling or soliciting function in the sale or delivery of such product or services,"

    b.   "where no amount of judgment or skill exercised by the participant has any appreciable effect" upon such payment," or

    c.   "where the participant is without that degree of control over the operation of such plan as to enable him substantially to affect the amount" of such payment.

198.    The TelexFree Pre-March 9 Contract, on its face, contains clear, obvious and direct violations of M.G.L. c. 93, § 69(d)(3)-(4), including:

Clause 5.4:  "ADCENTRAL PROMOTERS: After setting up his membership, a PARTNER may acquire an "ADCentral" kit consisting of 10 99TELEXFREE VOIP accounts, for which he must pay the equivalent of US$ 289.00 (two hundred and eighty-nine U.S. dollars)."

Clause 5.4.1:  "with this qualification, the PARTNER will become a TELEXFREE PROMOTER and, accordingly, shall have his own active ad central for 12 (twelve) months, counting from the date of his membership (and not from the date of the purchase of the kit)."

Clause 5.4.2:  "He must also post 1 (one) announcement (prepared by TELEXFREE) per day on internet announcement sites (whether free of charge or not), so that at the end of each cycle of 7 (seven) announcements for the week, the PROMOTER shall receive one 99TELEXFREE account."

Clause 5.5:  "ADCENTRAL FAMILY MEMBERSHIP – A PROMOTER wishing to attain the status of an "ADCentral FAMILY Member" must pay the equivalent of US$ 1,375.00 (one thousand three hundred and seventy-five U.S. dollars)."

Clause 5.5.1:  "With this membership, a PROMOTER shall have 5 (five) active announcement centrals for 12 (twelve) months, counting from the date of his

activation."

Clause 5.5.2: "He must, in turn, post 1 (one) announcement (prepared by TELEXFREE) per day at internet announcement sites (whether free of charge or not) on each one of the 5 (five) ADCentral sites. At the end of the 35 (thirty-five) announcements the PROMOTER shall receive 5 (five) 99TELEXFREE accounts as remuneration for these announcements."

199.    Fourth, searches of publicly available information disclosed the TelexFree fraud. At any time after the Brazilian anti-fraud agency Procon announced its investigation in January 2013, a search of the internet would have flagged TelexFree as a potential Pyramid/Ponzi scheme.

200.    In a January 11, 2013 press release, Procon indicated that its investigation of TelexFree revealed, "evidence of crimes ha[d] been detected." By February 15, 2013, news of Procon's press release was circulating in the online English-language media. Moreover, using Google's search function, a Google search for "TelexFree" in February 2013 would have brought up several websites characterizing TelexFree as a "fraude" in Portuguese on the first page of Google's search results. For example, an article entitled "TelexFree: a maior fraude financeira da história do Brasil" was published on February 27, 2013, and appears to have been well circulated on the Internet.  Later, on June 19, 2013, the Public Ministry of the State of Acre in Brazil shut down Ympactus' operations for allegedly operating an illegal pyramid scheme. News of this shutdown was immediately widely circulated online in Portuguese. English-language reports followed the next day. On June 20, 2013, an English-language online news source quoted a representative of the Brazilian government as saying:

Owners of the company [TelexFree] are suspected of mounting a financial pyramid. Telexfree in Brazil is recruiting investors and creating a pyramid scheme under the guise of multilevel marketing. There are multilevel marketing companies already established in the market as Herbalife, Mary Kay and Tupperware. They work with this system, in the case of Telexfree the interest is not to sell products but to recruit new people. The focus of Telexfree in Brazil is not the sale of products or services, but membership [of] new people to feed the payment system.

52

Searches after June, 2013 disclosed that Procon had essentially shut TelexFree down.

201.    Similarly, the investigations by the Massachusetts SOC and other government agencies were also reported on the internet. Google searches would have timely flagged official investigations into TelexFree as a suspected Ponzi scheme in this case. In April 2013, the Securities Division of the Office of the Secretary of the Commonwealth of Massachusetts (Securities Division of the Massachusetts SOC) opened an investigation into TelexFree and served it with a subpoena. James Merrill told TelexFree's outside CPA at the time, Joseph Craft, that TelexFree's banks had learned of this Massachusetts SOC investigation and were concerned about it. Craft was aware that TelexFree by then used Bank of America, Wells Fargo Bank, and TD Bank to provide banking services. Similarly, the U.S. Department of Homeland Security was investigating TelexFree for money laundering by October 2013.

202.    Even before the Procon investigation was announced, there were many reports of TelexFree's potentially unlawful activities.

**3.    Monitoring**

203.    Customer due diligence did not end with account openings. Instead, due diligence was an ongoing process. Financial institutions oversaw customer activities "through regular suspicious activity monitoring and customer due diligence processes." If there were signs of "a potential change in the customer's risk profile (e.g., expected account activity, change in employment or business operations), management [was to] reassess the customer risk rating and follow established bank policies and procedures for maintaining or changing customer risk ratings."

204.    Each MDL Defendant Bank also identified a number of "red flags" and "suspicious activities" through their customer monitoring systems. Some even closed accounts. All, however,

continued to knowingly assist the fraud and none notified authorities by filing a SAR or otherwise.

205.    For higher-risk customers such as TelexFree, financial institutions used enhanced due diligence throughout the customer relationship "for monitoring purposes and to determine whether there [were] discrepancies between information obtained regarding the account's intended purposes and expected account activity and the actual sources of funds and uses of the account."

206.    During this ongoing monitoring, higher-risk customers underwent more frequent and intensive scrutiny than lower-risk customers, particularly if new red flags appeared. These red flags notified financial institutions of suspicious conduct. FFIEC identified a long list of red flags of money laundering, including:

   a.   "Many funds transfers . . . sent in large, round dollar, hundred dollar, or thousand dollar amounts."

   b.   "Funds transfer activity . . . when the activity is inconsistent with the customer's business or history."

   c.   "Many small, incoming transfers of funds . . . received."

   d.   "Funds transfer activity is unexplained, repetitive, or shows unusual patterns."

   e.   "Payments or receipts with no apparent links to legitimate contracts, goods, or services are received."

   f.   "A large volume of cashier's checks, money orders, or funds transfers is deposited into, or purchased through, an account when the nature of the accountholder's business would not appear to justify such activity."

   g.   "Unusual transfers of funds occur among related accounts or among accounts that involve the same or related principals."

   h.   "Goods or services purchased by the business do not match the customer's stated line of

business."

i.    "Payments to or from the company have no stated purpose, do not reference goods or services, or identify only a contract or invoice number."

j.    "Customer receives large and frequent deposits from online payments systems yet has no apparent online or auction business."

k.    "A large number of incoming or outgoing funds transfers take place through abusiness account, and there appears to be no logical business or other economic purpose for the transfers, particularly when this activity involves higher-risk locations."

207.    Large financial institutions used sophisticated automated systems to analyze funds moving in and out of accounts for red flags requiring immediate attention.  The MDL Defendant Banks each utilized such systems. During their relationships with TelexFree, each MDL Defendant Bank identified TelexFree as a fraudulent enterprise.

208.    First, the TelexFree accounts experienced a very high number of chargebacks. Chargebacks are an indication of potentially fraudulent activity because they result when a customer challenges or cancels a payment. They are indications that customers are dissatisfied with the service or maintain that they have been charged in error.  When levels of chargebacks are high, therefore, it is a strong indication of illicit activity. TelexFree accounts at each Defendant Bank incurred high levels of chargebacks.

209.    The Banks' monitoring of TelexFree's accounts also showed that the activities in the accounts did not match TelexFree's representations about how the accounts would be used. The vast amounts of money passing through the accounts far exceeded what TelexFree told the Banks when the accounts were opened.

210.    For instance, TelexFree represented in its Merchant Account Application to Bank

of America that its account number 1885 would have an annual credit card volume of only $500,000. By February 2013 monthly credit card volume alone exceeded that amount.

211.    Similarly, the transactions in the accounts did not match TelexFree's representations to the Banks about its business. The Banks all had the ability to see, and reviewed, the individual transactions in the TelexFree accounts. This review disclosed that virtually all of TelexFree's payments were for ADCENTRAL and ADCENTRAL FAMILY memberships. Almost none were for TelexFree's purported principal business -- the sale of 99TelexFree Voice subscriptions. This fact confirmed beyond any doubt the true nature of TelexFree's operations.

212.    The TelexFree accounts displayed numerous other red flags as well, including large unexplained transactions, transfers between related accounts, and an exceptionally large number of chargebacks.

### 4.    Money Laundering

213.    Many of the irregularities identified by the MDL Defendant Banks also bore the hallmarks of money laundering.

214.    TelexFree deposited investors' money into bank accounts under its name at multiple banks. In many cases, the duped investors deposited their investments directly into TelexFree bank accounts. This is apparent from the SOC's review of certain TelexFree bank accounts, which found "unusual patterns of deposits, withdrawals and transfers—in many cases at very high frequencies and often in cash," with "scores of daily deposits in small sums by participants." "The vast majority" of these small deposits "appear[ed] to be buy-in fees for TelexFree promoters." In other cases, TelexFree victims paid for their investments using credit cards. These credit card payments were processed and bundled by the defendant payment processors for later deposit at TelexFree's banks. Still other deposits by TelexFree victims were made online or through overseas wire transfers.

215.    Once these funds were deposited, TelexFree's ensuing movement of those funds presented the classic signature of a money laundering scheme. Generally, money laundering consists of three basic steps—placement, layering, and integration--which "cleanse" the proceeds from criminal activities through a series of transactions so that they appear to be proceeds from legal activities:

216.    *Placement* involves the introduction of unlawful proceeds into the financial system with the hope of not attracting the attention of financial institutions or law enforcement. TelexFree accomplished the placement step by pretending that the payments by its participants related to the legitimate sale of VoIP programs.

217.    *Layering* "involves moving funds around the financial system, often in a complex series of transactions to create confusion and complicate the paper trail." The purpose of layering is to mask the trail of the original source of funds. Examples of layering include "wiring and transferring funds to and through numerous accounts in one or more financial institutions." TelexFree-related entities maintained multiple bank accounts at Bank of America, N.A., and at other banks through which they shuttled funds through wire transfers and otherwise.

218.    *Integration* creates "the appearance of legality through additional transactions," such as through the purchase of real estate or investment securities.

## J.    THE ROLE OF PAYMENT PROCESSORS

219.    The Payment Processing MDL Defendants (or "Processors") played an integral role in the TelexFree Scheme. They allowed TelexFree to collect payment for the sale of ADCENTRAL and ADCENTRAL FAMILY memberships via credit card. Over the course of its scheme, Telex Free collected over one billion dollars via credit card payments facilitated by the Payment Processing MDL Defendants.  The Processors also provided ongoing assistance to manage TelexFree's ongoing problems in obtaining essential financial services, including devising

and executing strategies to conceal TelexFree's illicit activities and to avoid oversight and regulation by law enforcement and regulatory authorities. They also worked to find new financial service providers to replace those who ceased their work for TelexFree as a result of the various investigations and other oversight activities by law enforcement and regulatory authorities. The Payment Processors (with some exceptions) also facilitated and enabled TelexFree to make payments to its members to perpetuate the scheme. This is relevant here as Wells Fargo Bank, Montalvo's employer, worked together with payment processors as set out below.

220.    Like the Bank MDL Defendants, the Payment Processing MDL Defendants were aware of the fraudulent nature of the TelexFree scheme and were required by law to investigate new clients. Each Processor learned that that TelexFree was operating an unlawful enterprise as part of their initial investigation. Second, like the Banks, the Processors were required by law to monitor the activities of their clients during the customer relationship. Each Processor gained knowledge that TelexFree was operating an unlawful enterprise as a result of their ongoing monitoring. The Processors also gained knowledge of TelexFree's unlawful activities as a result of notifications and demands for formal investigative reports of suspicious and "red flag" activities from their associated banks related to TelexFree's operations as well as personal interactions with TelexFree insiders, among other things. .

221.    In general, the Payment Processors knew from their initial investigations that TelexFree was a fraudulent operation because their investigations showed, among other things: 1) TelexFree was a multi-level marketing operation, and, therefore, suspect; 2) that it was being investigated as an unlawful pyramid/Ponzi scheme by authorities around the world; 3) that it illegally promised its members guaranteed returns on passive investments; and 4) that it was on chargeback watch lists maintained by MasterCard and Visa for the purpose of identifying fraud.

222.    In general, the Payment Processors confirmed based on their monitoring of TelexFree's accounts that it was a fraudulent operation because, among other things: 1) TelexFree's accounts experienced high charge back levels; 2) virtually all of the payments received by TelexFree (i.e. 99%) were for memberships guaranteeing passive income, not the sale of VOIP products; 3) many other ways in which the activity in TelexFree's accounts did not match its purported business model; and 4) ongoing refusals of banks to work with TelexFree. In addition, the government investigations around the world progressed and were prominently reported on various websites.

223.    Many of the Payment Processors also knew that some of the TelexFree Insiders and Top Promoters had been associated with other well-known MLM Pyramid/Ponzi schemes.

224.    With this knowledge, the Payment Processing MDL Defendants provided substantial and essential assistance to TelexFree in the perpetuation and expansion of its Scheme, including without limitation:

a.    Opening TelexFree's payment processing accounts;

b.    receiving and processing payments made by Promoters to TelexFree;

c.    making and processing payments to Promoters from TelexFree's accounts;

d.    holding illicit funds for the benefit of TelexFree, its affiliated entities and its Defendant Insiders and transferring them to personal and foreign accounts, foreign companies and shell companies to avoid regulatory scrutiny and/or seizure;

e.    transferring illicit funds between TelexFree entities, which funds were then held for the benefit of the Defendant Insiders, including transferring TelexFree funds to personal accounts of the TelexFree Insiders, including foreign accounts, foreign

companies and shell companies to avoid regulatory scrutiny and/or seizure.

**1.      How the Payment Processing System Works**

225.     While a credit card transaction generally takes less than a minute to complete, the process is complex and involves several parties.

226.     A credit card is issued by a bank called an "Issuing Bank" or "Issuer".  The Issuing Bank is responsible for payment for purchases by the card holder. Because it pays for the purchase and then bills the cardholder later, it assumes the risk of non-payment by the cardholder.

227.     In order to accept credit and debit card transactions, a merchant must contract with a bank called an Acquiring Bank or Acquirer. The Acquiring Bank receives payment from the Issuing Bank and transmits it to the merchant.

228.     If a purchaser reverses a purchase because, for example, the credit card transaction was not authorized properly or was fraudulent, it is called a "chargeback."  The Acquiring Bank assumes the risk that if there is a chargeback, the Merchant will not repay the funds it received. In other words, it essentially extends a line of credit to the merchant for the charge back time limit expires.

229.     The Acquiring Bank will typically hold back a portion of the funds due the merchant in a separate account as a security. Such an account is called a "Merchant Account Reserve". This way, Acquiring Banks insulate themselves against loss in the event that a merchant experiences excessive chargeback.

230.     Payment or Card Networks like Visa, MasterCard, American Express, and debit cards serve as the link between acquiring banks and issuing banks. The Card Network also authorizes 1) the Issuing Banks to issue credit cards linking the network to their customers and 2) the Acquiring Banks to enter relationships with their merchants as part of the network.

231.     Payment Processors provide the link between the merchant and the Acquiring Bank

60

and the credit card network. Among other things, the Processors collect and consolidate money from large numbers of transactions and transmit it to the Acquiring Bank. The Processors may also withhold money and maintain Merchant Account Reserves. The Processors also provide Automated Clearinghouse services (known as "ACH").

232.    Charge backs evidence fraud, trigger reporting requirements for the bank and require the bank to recover money paid to the merchant. Charge backs, therefore, present expensive problem for Acquiring Banks. They also present a credit risk – i.e., the possibility that the Acquiring Bank will not be able to recover the payments it has made to the merchant. A charge back rate of over 1% is regarded as excessive and generally will not be tolerated by banks, payment processors or the Card Networks.

233.    The Card Networks maintain records of merchants with excessive charge backs. MasterCard maintains a database called MATCH for this purpose. A MATCH listing indicates that a merchant is no longer to receive any credit card processing services due to exceptionally high risk. A MATCH Listing is a permanent record that follow a merchant and is seen by each Financial Service Provider.

234.    A credit card transaction consists of the following steps:

a.    Cardholder: Uses card for a purchase from the Merchant, who enters Cardholder information into the Payment Gateway and authorizes the transaction.

b.    Payment Gateway: The computer link to the Card Network which transmits the transaction information to the Payment Processor.

c.    Payment Processor: Serves as a facilitator on behalf of the Acquiring Bank by forwarding transaction information from the Payment Gateway to the Card Network.

d.   Card Network: Routes the transaction information to the correct Issuing Bank in order to receive the Issuing Bank's authorization.

e.   Issuing Bank: Receives and verifies the transaction information; if the credit or debit is available, the issuer sends an authorization code for the transaction back to the Card Network.

f.   Card Network: Receives the authorization approval from the Issuing Bank, then forwards the authorization to the Processor.

g.   Payment Processor: Receives the issuer's authorization approval from the Card Network, then forwards that information to the Payment Gateway.

h.   Payment Gateway: Receives the Issuing Bank's authorization approval from the Processor, forwards it to the Merchant to complete the transaction.

i.   Merchant: Receives the authorization, fulfills the order, and batches the transaction information along with the rest of the day's sales.

j.   Acquiring Bank: Receives the batched transactions at the end of the day, then deposits an amount into the Merchant's account equal to the total of the batch, minus applicable fees, holdbacks, etc.

235.   Payment Processors can only operate in conjunction with an Acquiring Bank. The Acquiring Bank dictates the procedures and practices the Processor must follow. It also dictates the types of transactions merchants may engage in and the specific terms and conditions merchants must adhere to. Since an Acquiring Bank can terminate its relationship with a Pay Processor or any merchant at any time, the Payment Processors are at all times beholden to the Acquiring Bank.

236.   The Processors are subject to the same rules, regulations, regulations and restrictions applicable to Banks detailed above. They are also generally subject to their Acquiring

Bank's Know Your Customer and other monitoring protocols.

237.    As explained above, Banks, including Acquiring Banks, are required to investigate new customers and, after they are accepted as customers, monitor their activities for money laundering and fraud under the BSA, Patriot Act and other anti-money laundering rules and regulations. Acquiring Banks develop their own mandatory protocols and procedures for this purpose. Most banks have highly sophisticated departments devoted to this process, and all have continuous computer driven analysis that identifies red flag transactions for mandatory review.

238.    Payment Processors are involved in the investigation and monitoring of merchant activity. Acquiring Banks often first call upon Pay Processors to do the initial investigative work on a questionable transaction.   The Acquiring Banks communicate regarding the Processor's knowledge of a merchant and each questionable or batch of questionable transactions as part of their mandatory process of determining whether further investigation is needed and whether a merchant's processing services should be continued, terminated, or otherwise acted upon.

239.    As a result of a period of especially heavy chargebacks, TelexFree was added to MasterCard's MATCH database in 2012, indicating that TelexFree was no longer to receive any credit card processing services due to exceptionally high risk.

240.    TelexFree, at least as early as the Spring of 2013, was also listed on Visa's chargeback problem list.  As one Processor executive informed TelexFree executives in August of 2013: "[n]o US Bank or Processor . . . will accept your [TelexFree] business given that you are on month five of the Visa Chargeback monitoring program.  You are one of only three merchants in the USA on month five so you are a real hot-potato as they say."

241.    As TelexFree was cut off by some financial institutions, some of the Payment Processors also assisted TelexFree in obtaining the services of other financial service providers

necessary for TelexFree's operations to continue and, along with the TelexFree Insiders, devised and implemented ways that TelexFree could avoid regulatory oversight and continue the fraud.

242.    For example, by August 2013, TelexFree was struggling to find financial services partners as a result of the Brazilian shutdown and issues—including excessive chargebacks—faced by TelexFree's business in the U.S. In response, GPG, Base Commerce, and Vantage Payments leveraged their industry connections and knowledge to assist the TelexFree scheme, including "sneaking" payouts on TelexFree's behalf.

243.    Hughes and Base Commerce brought in Vantage Payments to act as a broker on TelexFree's behalf. Vantage Payments in turn applied to Allied Wallet on TelexFree's behalf and formed a shell company in the United Kingdom—TelexFree, LTD—to serve as TelexFree's EU-based operation. As a result of Vantage Payments' efforts, Allied Wallet agreed to provide payment processing services to TelexFree. Vantage Payments continued to serve as a primary contact between Allied Wallet and TelexFree. Sparman, Vantage Payments managing partner, later successfully negotiated with Allied Wallet on TelexFree's behalf to avoid a threatened increase in Allied Wallet's rolling reserve and to increase Allied Wallet's processing volume for TelexFree.

244.    During August 2013, GPG's Amirie participated in strategy sessions with Merrill and others to devise a way for TelexFree to continue to process electronic transactions. Bank Card Consultants was identified as a potential resource during these sessions and was brought into the scheme in September 2013 as an "International Account."

245.    Also during August 2013 and in response to the challenges facing TelexFree's U.S. business, GPG and Base Commerce—through Amirie and Hughes—advised TelexFree to seek off-shore banks and on other ways to reduce chargebacks and avoid stringent monitoring under

U.S. banking laws.

246.    In September 2013, despite the fact GPG was no longer involved in monetary transactions for TelexFree, Amirie allowed TelexFree to continue to use the GPG gateway to transmit electronic data to Allied Wallet until October 10, 2013. During September 2013 alone, GPG and Allied Wallet processed $21.5 million for TelexFree, of which there were numerous declined charges.

247.    In September 2013, Base Commerce, on TelexFree's behalf, also arranged for TelexFree to use ACH processing services through IPS as a means to avoid the oversight of regulators and banks.

248.    Like the Banks, each Payment Processing Service Company MDL Defendant performed all of the investigations and monitoring required of it by the federal government and gained actual knowledge that TelexFree was operating an unlawful enterprise.  Despite this knowledge, each Processor provided essential assistance to TelexFree's fraudulent scheme.

**K.    THE ROLE OF THE LICENSED PROFESSIONALS**

249.    Running a massive, global Ponzi scheme is complicated. TelexFree brought in the most experienced MLM experts available to guide them on how to continue bringing in millions of dollars from victims while avoiding the attention of regulators. All of them were in a position to recognize TelexFree as a Pyramid/Ponzi scheme on its face and they did. Yet, despite knowing that TelexFree was a Pyramid/Ponzi scheme and – for many of the Licensed Professionals – ethical obligations imposed by their licensing authorities, the Licensed Professionals turned a blind eye to TelexFree's illegality and instead leveraged their contacts and considerable expertise to assist in TelexFree's continued growth.

250.    Each individual Licensed Professional MDL Defendant was brought into the scheme for their particular expertise.

251.    Attorneys Nehra and Waak are self-proclaimed MLM experts of some thirty years standing. They, individually and through their respective law firms and partnerships were the first attorneys to join TelexFree, with a retainer agreement in or about May 2012. Nehra reviewed TelexFree's documents and willingly participated in marketing events and materials professing TelexFree's legality. Once the scheme was too much for Nehra to manage, he recommended that TelexFree bring in MDL Defendant Babener, another MLM expert attorney.

252.    MDL Defendant Babener joined the scheme in August 2013 and immediately recognized TelexFree as a Ponzi/Pyramid scheme. Babener participated in and advised on almost every aspect of the scheme – from Promoter agreements to international restructuring to criminal defense. Babener leveraged his contacts and expertise in the MLM space to assist TelexFree and assemble a team of experts to perpetuate TelexFree's continuing fraud, ultimately serving as a de facto CEO for the company.

253.    First, Mr. Babener reached out to Mike Sheffield and The Sheffield Group, another group of self-described MLM experts, for assistance in revising TelexFree's compensation plan. Babener and Sheffield had worked together many times before and Babener was clear with Sheffield and his team from the beginning that TelexFree's guaranteed compensation plan was illegal. Even with Babener's warning, Sheffield and his team came on board and continued to work with TelexFree until the bankruptcy filing. The Sheffield team worked on revising TelexFree's compensation plan and were clear that the plan only worked as a Pyramid scheme – the numbers just wouldn't work any other way.

254.    Next, Babener reached out to attorneys he knew at Garvey, Schubert & Barer to support him on legal issues. Babener sought out MDL Defendant Weaver, and then MDL Defendant Kauffman, for their criminal defense expertise in light of Babener's concern that the

Brazilian shut down could lead to issues for TelexFree within the U.S. too. Babener sought to add MDL Defendant Tober and MDL Defendant Sandford to the team for their international restructuring expertise.

255.    In his very first email to the Garvey Schubert Barer attorneys, Babener highlighted the issues with TelexFree's plan yet the Garvey Schubert Barer attorneys agreed to represent TelexFree anyway. Kauffman and then Weaver worked to address criminal issues and on strategies to shield TelexFree from the notice of regulatory authorities, eventually bringing another lawyer into the team to focus on quieting Promoter complaints. Tober and Sandford worked on a global restructuring plan, in consultation with PWC, designed to offshore TelexFree's assets and shield them from recovery by victims of the scheme. For example, in March 2014, knowing that the Massachusetts Securities Division investigation was closing in on TelexFree, MDL Defendant Sandford formed TelexFree's Grand Cayman entity in a matter of days. Both Tober and Sandford strategized on the best ways for TelexFree to continue processing victim's funds while evading U.S. jurisdiction. Sandford also participated in seeking out new banking partners for TelexFree following account closures towards the end of 2013. Babener recommended another Garvey Schubert Barer attorney to the team to advise on immigration issues facing high-performing Promoters seeking to attend a TelexFree marketing event.

256.    Later, Babener recommended Richard Colabella of PwC as a contact of some twenty-plus years who could assist TelexFree with its tax and international restructuring needs. In late 2013 or early 2014, PwC joined the scheme. PwC worked with Settled Defendant Craft and MDL Defendants Tober and Sandford to develop a plan for TelexFree's international restructuring, again with the focus on avoiding U.S. jurisdiction and shielding TelexFree's assets. PwC also advised and participated in TelexFree's tax strategy, that led to the issuance of fraudulent 1099

forms to Promoters.

### A.    DETAILED ALLEGATIONS REGARDING MICHAEL MONTALVO

#### 1.  *Background Allegations*

257.    Michael Montalvo was employed by MDL Defendant Wells Fargo Bank, N.A. and worked in tandem and in concert with MDL Defendants Mauricio Cardenas and Wells Fargo Advisors.  MDL Defendant Wells Fargo Bank, N.A ("WF Bank" or "WFB") and MDL Defendant Wells Fargo Advisors ("WF Advisors" or "WFA") are related entities and subsidiaries of their parent company, Wells Fargo & Company.  Throughout the time period relevant to the claims against them, they acted in concert and as one without a legal distinction. Defendant Michael Montalvo was employed by WFB and worked closely and in concert with WFA and its employee and current MDL Defendant, Mauricio Cardenas. WF Bank provided banking services to TelexFree, its affiliates and principles from June 20, 2012 to April 2014. Montalvo became involved in servicing TelexFree in approximately December 2013 or shortly thereafter. In addition to providing depositary banking services to TelexFree, WFB also acted as an acquiring bank for TelexFree for payment processor ProPay, from approximately August 2012 to June 2013. As detailed below, later Wells Fargo Bank and Montalvo continued to service TelexFree despite closing accounts because of fraud related to the unlawful MLM by opening multiple bank accounts for TelexFree, affiliates and principals that were used to layer and syphon victim funds and by providing numerous banking services including but not limited to transfers of funds between accounts.

258.    Wells Fargo Advisors provided financial and investment services, maintained accounts, and received and executed transfers of funds from or for the benefit of Wanzeler and TelexFree  They also worked in tandem with TelexFree, Wells Fargo Bank, Cardenas, Montalvo,

and other MDL Defendants including all the PwC, Garvey Schubert, Nehra and Babener Licensed Professional Defendants to separate the victims funds from them and move them off shore for the express purpose of sheltering it out of the reach of the United States justice system.

259.    MDL Defendant Mauricio Cardenas worked together with Montalvo and was employed as a financial advisor with Wells Fargo Advisors as a registered broker-dealer and a registered investment advisor under the Investment Advisers Act of 1940.  Cardenas, importantly, was also Wanzeler's friend, confidant and primary financial advisor and in this capacity shared information regarding Wanzeler and TelexFree with Montalvo.  Despite having actual knowledge that TelexFree was an unlawful Pyramid Scheme and that Wanzeler was at the top level of the fraud, over time Cardenas became chiefly responsible for strategy and implantation of plan actions taken by Wanzeler and the above group, regarding funds received through the TelexFree Pyramid Scheme including funds that Wanzeler siphoned.  Cardenas worked together with Montalvo in this endeavor with Montalvo playing a major role.

260.    WF Advisors and WF Bank are vicariously, jointly and severally liable for the actions taken by these employees, agents, and representatives.  Defendant Michael Montalvo and MDL Defendant Mauricio Cardenas performed duties related to and in the ordinary and usual course of their employ for both Wells Fargo Bank and Wells Fargo Advisors with the knowledge and consent of management.  Michael Montalvo worked closely with Cardenás in servicing TelexFree, they shared relevant information with each other regarding TelexFree and its principals and referred to themselves as a "two-advisor team."

261.    Cardenas was assigned and utilized both a Wells Fargo Bank and Wells Fargo Advisors email address throughout his tenure with Wells Fargo. His and Montalvo's knowledge and acts are imputed to both WF Bank and WFA.  WF Bank, WF Advisors, Cardenas, Montalvo

and others including management as a matter of Wells Fargo policy shared information and specifically shared information regarding TelexFree, James Merrill, Carlos Wanzeler, Katia Wanzeler and Sanderley Rodrigues de Vasconcelos, and their related persons and entities or purposes in assisting the TelexFree Scheme. Upon information and belief, Cardenas, Montalvo and others communicated with Carlos Wanzeler, his wife Katia Barboza Wanzeler and others related to, and on behalf of TelexFree through personal email, text messages and telephone. Cardenas often stayed at the Wanzeler residence during frequent trips to TelexFree's World HQ in Massachusetts.

262.    Wells Fargo Bank served as an acquiring bank with respect to TelexFree Promoter payments and also acted as a depository bank for TelexFree and its known associated persons and entities, including Carlos and Katia Wanzeler. WF Advisors, through Cardenas, also opened a brokerage account for Katia Wanzeler for the benefit of TelexFree with a related WFB account. The related transactions include transactions facilitated by MDL Defendant Mauricio Cardenas and Defendant Montalvo, who were integral to the TelexFree Scheme and who advised and assisted the Scheme with unlawful laundering, layering, smurfing and offshoring sheltering of TelexFree victim funds.

263.    Montalvo, along with all these MDL Defendants engaged in the above tasks and activities and provided substantial assistance to TelexFree with actual knowledge that TelexFree was engaged in an illegal Pyramid scheme to the damage of the investors and that the services provided were in furtherance thereof.

### a.    *Actual Knowledge*

264.    As detailed below, soon after opening its first account in 2012, Wells Fargo gained actual knowledge that TelexFree was an illegal enterprise or otherwise engaged in unlawful or fraudulent activity through its industry leading three level BSA/ALM system. Through this system

and through communications with Cardenas and others, Montalvo also gained actual knowledge that TelexFree was an illegal enterprise or otherwise engaged in unlawful or fraudulent activity.

265.    It is not disputed that during the relevant period, Wells Fargo operated a sophisticated BSA/AML compliance program, befitting its rank as a top U.S. bank.  In 2013 and 2014, the years at issue here, Wells Fargo & Company (the parent company of Well Fargo Bank, N.A., and Wells Fargo Advisors, LLC) was the nation's fourth largest banking enterprise in terms of assets. By 2014, Wells Fargo & Company boasted $1.636 trillion in total assets and was one of the world's leading financial institutions.   Wells Fargo publicly acknowledges that it has "special" anti-money laundering responsibilities as one of the world's leading financial institutions:

> As a global financial institution, we have special responsibilities to help combat money laundering.  Our Global AML Governance Policy and related procedures are designed to comply with all applicable laws and regulations related to money laundering and terrorist financing.  Team members are required to comply with these policies, procedures, and controls.

266.    As a top-tier U.S. bank, Wells Fargo & Company and its subsidiaries operated an advanced BSA/AML compliance system, designed to monitor financial transactions, recognize suspicious activity and identify red flags of illegal or fraudulent activity.

267.     Throughout the relevant period, and at the start, Wells Fargo similarly operated an elaborate risk management system employing thousands of risk employees.  This fact is evidenced through related documents and actions including account closing.  Later, WF Bank's actual knowledge is evidenced through direct sources and admissions.  It is in this context that Wells Fargo Bank's account opening, and ongoing account monitoring must be viewed.

268.    Inferences relating to Wells Fargo's actual knowledge at any time are also informed by what was actually going on during the relevant period.  Wells Fargo's Community Bank

strenuously pursued a sales model calling for "significant annual growth in the number of products, such as checking accounts, savings accounts and credit cards, sold each year." Under this sales goal model, "the number of accounts" that Wells Fargo employees "opened and the rate at which those accounts were funded were important to achieve sales goals and incentive compensation targets."

269.    It cannot be disputed that as part of Wells Fargo's sales goal strategy, "the Community Bank's senior management tolerated low quality accounts as a necessary by-product of a sales-driven organization. Also, that in order to keep "the sales model intact and sales growing," the Community Bank's managers "had to exert significant, and in some cases extreme pressure on employees to meet or exceed their [sales] goals." Branch employees and their managers had "minimum requirements for products sold per day" and were held responsible for "consistent year-over-year sales growth." The Community Bank used daily scorecards to rank its employees "against one another on their performance relative to goals," creating "intense pressure to perform" and a "culture of shaming." Starting in 2010, employees who failed to meet sales goals faced "poor performance reviews" as well.

270.    Wells Fargo's Florida branches boasted some of the most aggressive sales managers and sales practices nationwide. In their 2018 report, Wells Fargo's independent directors specifically singled out Shelley Freeman, the Lead Regional President in Florida from 2009 until 2013, for blame as "an aggressive sales manager who created significant sales pressure." Wells Fargo's internal documents make clear that sales misconduct extended to "dishonest" acts involving selling bank accounts and other products to the "wrong customer" during this period. Moreover, in these incidents, Wells Fargo opened accounts that "never should have been sold to the customer in the first place." It is no surprise that in the aftermath of the sales abuse scandal,

Wells Fargo opened a review into its failed procedures for freezing and closing accounts after the company detected suspected fraudulent activity by third parties or account holders that affected those accounts.

271.    A review of individual TelexFree account statements at Wells Fargo shows that aggressive sales goals figured prominently in Wells Fargo's opening and handling of TelexFree and related accounts.  Specifically, some of the most egregious sales practices implicated in the Wells Fargo scandal are apparent from the TelexFree and related party account statements at Wells Fargo. For example:

a.    One way to artificially boost sales at Wells Fargo was to bundle products such as by marketing debit cards as "coming with" personal accounts or checking accounts sold as a unit with other products. Wells Fargo sold defendant Katia Wanzeler bundled products in the form of a "PMA Account" combining a brokerage account with two bank accounts. Similarly, Wells Fargo Bank, N.A., sold her husband, defendant Carlos Wanzeler, a debit card, a credit card, and credit insurance along with a checking account and a savings account.

b.    Another improper way to inflate sales was to sell "secondary" checking accounts (*i.e.*, accounts sold to customers who already had a checking account).  At account opening, Wells Fargo sold TelexFree, LLC, four deposit accounts, including one secondary checking account and one secondary savings account.

c.    Finally, another improper way to meet sales goals was to open bank accounts that contained no funds.  Wells Fargo engaged in this practice with Katia Wanzeler and TelexFree, LLC.  Meanwhile, the first four bank accounts that Wells Fargo opened for TelexFree, LLC, would have been empty or almost empty in 2013

except for one recurring $150 deposit that shuttled back and forth among those accounts. This provided the misleading appearance of account activity.

272.    Wholly apart from TelexFree's own misconduct, these transactions indicate that the Wells Fargo employees who opened these accounts had their own improper motivations—in the form of meeting aggressive sales goals--for agreeing to do business with TelexFree and its principals and family members.

273.    As described throughout, each account opening triggers a mandatory fresh comprehensive BSA/ALM review. In addition to learning that it was an MLM scheme, which automatically subjected it to a higher level of scrutiny that included examination of its standard form contract, website, business plan, credit history, banking history and product, WF Bank discovered that (i) TelexFree was generating income from Brazil, (ii) the source of its income did not match its banking profile, (iii) it sold no product to speak of, (v) its business structure was an unlawful pyramid scheme, (vi) its Promoter Compensation Plan was unlawful because it expressly promised guaranteed passive income and payments for signing up new members without requiring product sales.

274.    From at least April 2013 through May 2014, Wells Fargo had mounting knowledge of suspected TelexFree fraud. Michael Montalvo also gained knowledge of this fraud by if not before early January 2014 through his communications with Cardenas and through employing WFB's procedures an protocols. WFB's and Montalvo's decision to retain TelexFree as its customer and provide it with more financial services despite that knowledge alone - lent substantial assistance to TelexFree's illegal scheme and allowed TelexFree to keep operating because they processed victim payments during the post Brazilian shut down and thereafter, as detailed below, with ever increasing volume and forbidden transactions. Defendant Montalvo was a part of this

culture and the substantial assistance provided.

275.    Additional facts that solidly support the inference that Wells Fargo had actual knowledge that TelexFree was operating an unlawful MLM include the fact that the well-publicized fraud that caused Bank of America to close its bank accounts in April 2013 was equally available to Wells Fargo and its employees that engaged in the various protocols. In context, Bank of America, and Wells Fargo Bank were both top four U.S. bank that year and Wells Fargo had better due diligence procedures, did comparable research, uncovered similar reports and in addition to its industry leading automated system, Wells Fargo also had a risk management system that used three lines of defense and its KYC investigation and reporting was specifically designed to identify and prevent precisely the breached of BSA/ALM that were rampant in the continued and expanding servicing of TelexFree.  As set forth below, Montalvo accessed several of these protocols.

276.    Even later in 2013 and during its mandatory, exacting and regular KYC monitoring and during every renewed KYC investigation and reporting that necessarily took place each time a new account was opened, WF Bank had knowledge that TelexFree generated staggering excessive chargebacks, well outside the industry standard maximum and its Brazilian parent company Ympactus was judicially charged and later found to be fraudulent and enjoined from operating an unlawful pyramid scheme.

277.    There is also direct evidence of actual knowledge of WFB long before Cardenas' and Montalvo's involvement. For example by April 2013, Wells Fargo had actual knowledge.

278.    It is not disputed that:

   a.    during or about April 30, 2013, Jonathan Andreoni, a "Banker and Officer" at a Las Vegas Nevada Wells Fargo Bank branch accepted applications from

TelexFree, LLC for four deposit accounts;

b.   that the purpose of the accounts was to take in victim funds, and then process and

place under them under the control of TelexFree;

c.   that each application listed James M. Merrill and Carlos Wanzeler as owners of

TelexFree, LLC's;

d.   That Wells Fargo, as part of its heightened MLM account opening protocol

reviewed TelexFree's website, www.telexfree.com which included a slideshow

presentation by TelexFree President Mr. Jim Merrill that laid bare TelexFree's

unlawful compensation plan.  The slideshow even went so far as to depict this

pyramid in describing the compensation plan:



e.   that account applications indicated that TelexFree, LLC represented that its

annual gross sales for the year ending December 31, 2012, totaled $100,000.00;

f.   that at the time Wells Fargo Bank opened these four Accounts it knew that

TelexFree's representation that it had gross sales of $100,000 annually was false because Wells Fargo Bank had processed $1,984,705.45 in revenue payments for TelexFree, LLC in 2013 while acting as its acquiring bank;

g.   and that notwithstanding this knowledge, by June 1, 2013, Wells Fargo had opened all four accounts under account nos. ending in 6723, 0264, 6715, and 0272.

h.   At the time he opened the account, Jonathan Andreoni was aware of the conflict between the representation and the actual revenue payments;

279.   This knowledge triggered the responsibility to comply with the account closing criteria in Wells Fargo Bank's CIP and required the Bank, short of closing, to treat TelexFree as higher risk and place TelexFree under heavy surveillance going forward.

280.   Within weeks, TelexFree's parent company Ympactus was shuttered. Wells Fargo's BSA/ALM systems picked up on this bombshell and in so doing gained actual knowledge that TelexFree, whose programs were identical, was an unlawful MLM/Ponzi scheme.

281.   Despite this knowledge, in early September 2013, Wells Fargo Bank agreed to open a merchant processing account for Bank Card Consultants to handle TelexFree transactions and began processing credit card payments for TelexFree. As part of a background check, Wells Fargo Bank received updated company and financial information for TelexFree. Similarly, Wells Fargo Bank kept operating its other TelexFree accounts. That decision, and its decision at the end of December 2013 to open *more* TelexFree accounts, lent substantial assistance to TelexFree's fraudulent activities and allowed TelexFree to stay in operation.

282.   Moreover, no later than December 2013, Carlos Wanzeler reached out to Mauricio Cardenás and asked for help with opening bank and investment accounts for himself, his wife

Katia and TelexFree. At that time, Wanzeler and Cardenás openly discussed the fact that TelexFree had been shut down in Brazil for being a pyramid scheme. They also discussed the negative publicity surrounding TelexFree, the fact that TelexFree was under investigation by the Massachusetts SOC, and the fact that TelexFree was experiencing difficulty securing banking and payment processing relationships and that its banking privileges had been terminated by multiple banks and pay processors. Cardenas shared much if not all of this information with Michael Montalvo shortly thereafter.

283.    Michael Montalvo played a major role in this aiding and abetting beginning in approximately in December 2013 if not before.  Plaintiffs could not have reasonably discovered Defendant Montalvo's role, complicity and knowledge of the TelexFree scheme, at the earliest with the affidavit of Joseph Craft dated January 22, 2020 and the eventual review of documents received in October 2019.

284.    Montalvo gained knowledge of the TelexFree Scheme through both Wells Fargo Bank and Cardenas and Wells Fargo Advisors. For that reason, some background on Wells Fargo Advisors is important.

285.     At all times Wells Fargo Bank and Wells Fargo Advisors shared the same BSA/ALM findings. Likewise, Wells Fargo Advisors was privy to the same information and knowledge that WFB obtained both from its own compliance systems and through its employee, Mauricio Cardenas.

286.    Wells Fargo Advisors is a registered broker-dealer and subject to the same laws and regulations alleged herein regarding potential and established client accounts as the Financial Services Providers, including the Bank Secrecy Act (as amended by the USA PATRIOT Act), the Foreign Corrupt Practices Act, and critical anti-money laundering mandates such as Know Your

Customer and Customer Identification Program requirements. 31 U.S.C. §§ 5311 et al.; 31 C.F.R. Chapter X & pt. 1023; FINRA Rule 3310; U.S. Securities & Exchange Commission, Anti-Money Laundering (AML) Source Tool for Broker-Dealers (Jan. 11, 2017), https://www.sec.gov/about/offices/ocie/amlsourcetool.htm; Financial Crimes Enforcement Network et al., Guidance on Obtaining and Retaining Beneficial Ownership Information (Joint Release March 2010), https://www.sec.gov/rules/other/2010/34-61651-guidance.pdf; 15 U.S.C. §§ 78dd-1, et seq.; FINRA Regulatory Notice 11-12, http://www.finra.org/industry/notices/11-12. All allegations regarding the duties and legal obligations of the Financial Services Providers, and the facts, information and knowledge gained by those providers in performing those duties and due diligence, are incorporated herein by reference as to Wells Fargo Advisors.

287.    Wells Fargo Advisors similarly possessed a Regulatory Account Monitoring Department that was charged with researching and obtaining information on prospective and current customers.

288.    Wells Fargo Advisors possessed the same federal regulatory duties as those cited above for the Financial Services Providers to look for certain types of facts or lack thereof, including the identity and purpose of the individuals opening and making payments into their accounts.

289.    In addition to reviews carried out in the normal course of business, Wells Fargo Advisors carried out other reviews in accordance with their regulatory duties that revealed, among other things, 1) TelexFree's tortious Pyramid Scheme; 2) TelexFree's business model; 3) TelexFree's legal troubles and notorious history; 4) TelexFree's regulatory troubles in the United States and in Brazil; 5) Wanzeler's modest background and rapid rise to substantial wealth; 6) the fact that the source of the substantial funds Wanzeler handed over to Wells Fargo Advisors

was derived from unlawful sources; 7) the substantial role Wells Fargo Advisers assumed through their employee Cardenas in the management of Wanzeler and TelexFree's illicit fund management; 8) the suspicious, tortious and illegal activities related to the funds it was managing, including the outright fraud on the part of TelexFree, its Founders and Principals, including Wanzeler; and 9) the overwhelming number of Red Flags and the other indicia of fraud that more than reasonably established the existence of TelexFree's and Wanzeler's tortious conduct and the Pyramid Scheme.  WF Advisors was obligated to know its client and monitor accounts of existing clients

290.    Wells Fargo Advisors also became aware of the Red Flags surrounding Wanzeler and TelexFree during the routine course of fulfilling their regulatory duties and while reviewing Cardenas' deal making, sales, job performance and entitlement to performance related payments.

291.    Wells Fargo Advisors employed MDL Defendant Cardenas from 2012 until he was terminated in 2014 and had actual knowledge of, and oversaw, his dealings with Wanzeler.  Wells Fargo Advisors oversaw Cardenas' investment activities and maintained a detailed account of the profits made on behalf of his clients.

292.    While Cardenas was acting as Wanzeler's co-conspirator, he did so as an agent, servant and/or employee of Wells Fargo Advisors and WF Bank and as such Cardenas' conduct is imputed to the companies he represented. He also worked together with Montalvo and shared information about Wanzeler and TelexFree.

293.    Also, throughout this time, Cardenas was Wanzeler's friend, confidant and primary financial advisor and well aware of the TelexFree scheme. Cardenas and Wanzeler lived in proximity to each other and over time spent considerable amounts of time together.  In addition to aiding and abetting Wanzeler launder, conceal and invest unlawful funds, Cardenas also enjoyed

frequent social interactions with Wanzeler, including speedboat outings, barbecues and travel. Through this relationship he knew that Wanzeler and TelexFree where engaged in an illegal scheme.

294.    Wanzeler and Cárdenas openly discussed the fact that TelexFree had been shut down in Brazil as a pyramid scheme.  They also discussed the negative publicity surrounding TelexFree, that TelexFree was under investigation by the Massachusetts SOC, and that TelexFree was experiencing problems securing banking and payment processing relationships.

295.    Undeterred, Cárdenas promised to assist TelexFree with opening up accounts at Wells Fargo Bank, N.A., and providing banking services.  Cárdenas proceeded to help Wanzeler successfully apply for two TelexFree Financial, Inc., deposit accounts with Wells Fargo Bank on December 28, 2013.  Wells Fargo banker Wendy Flores at the Lighthouse Point, Florida, branch processed the application.  Wells Fargo assigned numbers ending in 4252 and 3387 to the two accounts.  This assistance from Wells Fargo Bank through Cardenas substantially aided TelexFree's pyramid scheme since other banks were refusing to serve the company and otherwise, TelexFree's pyramid scheme would have promptly collapsed.

296.    Michael Montalvo played a major role in assisting TelexFree, Wanzeler and Merrill with opening WFB accounts.  In furtherance of this endeavor, Montalvo requested and received investigation reports for the purpose of "on-boarding" Carlos Wanzeler, James Merrill and Telexfree.  The final investigative report on Wanzeler was done on January 7, 2014 and identified TelexFree and the issues in Brazil. The final investigative report on TelexFree identified both Wanzeler and Merrill as principles in the company. This report called "Final Investigation Summary Report" on Carlos Wanzeler, requested by Michael Montalvo, is dated 1/7/14 and includes an embedded Portuguese news article in small font dated July 9, 2013 titled "Telexfree e

derrotada pela 3 vez no Acre e pagamentos seguem bloqueados." The first paragraph of the article includes "Acusada a ser a major piramide financeira da historia do Brasil." It identifies Wanzeler and Merrill as connected to the company and it shows Wanzeler was charged with possessing/using a false or stolen Registry document in Worcester, MA in 2002.

297.    In addition, the Wells Fargo Credit Investigations Group (Beatrice Hernandez) created a "Due Diligence Report" on Wanzeler , which upon information and belief was known by Montalvo, which generates a warning of "multiple identities associated with the input SSN," also identifies Antonio DaSilva, also reports the CADICON listing and includes a larger font version of the Portuguese article.

298.    Montalvo worked to provide information to supervisors at WFB in an effort to help get accounts opened for TelexFree, Wanzeler and Merrill by preparing and providing information to others.  His efforts show that he had full and complete knowledge that TelexFree was a fraudulent entity and that Wanzeler was the leader.  For example, the same article referenced above was part of two attachments to an email dated 1/16/14, from Montalvo to Cardenas with three total attachments.  This email had been a forwarded chain from earlier that day, involving Montalvo and other WFB employees, Mark Middlebrook and John Pisan.. The first attachment to the email was the "Wanzeler SOW."  This is a document that shows the source of wealth for Wanzeler which Montalvo put together.  The second attachment is the FISR (Final Investigative Summary Report) which contains a copy of the article that has "See comments on due diligence report" handwritten in the column. The third attachment is the "Due Diligence Report" that has handwriting all over it as well.

299.    In addition, also mid- January, Wanzeler was introduced to Montalvo by Cardenas at a meeting in Orlando at which they discussed that TelexFree was under investigation in Brazil.

300.    Montalvo continued to communicate with others at WFB, proving additional information to management, John Pisan and Mark Middlebrook, in an attempt to clear Wanzeler and TelexFree. The "SOW" he provided included a detailed summary on Wanzeler, his wife Katia, Diskavontade, and Telex with a reference to a pending case in Brazil, where Telexfree is being investigated for allegedly operating as a Ponzi scheme and references to Telex, Cleaner Image, Merrill, JD Real Estate, BWFC Processing, and Telex Articles. The third attachment also includes printouts from the Nehra and Waak website and Babener's website.

301.    There is no doubt that by early January 2014, Wells Fargo and Montalvo actually knew about negative publicity that TelexFree was a pyramid scheme and had internally voiced its concerns. Cardenas and Montalvo discussed with each other their concerns that they may not be able to land these large customers. In light of this, Wells Fargo Advisors' employee Cárdenas asked Joseph Craft, TelexFree's CPA to write a letter to John Pisan at Wells Fargo Advisors, LLC, providing assurance that other financial institutions had also established accounts with TelexFree which he did.

302.    Despite learning of ongoing concerns and information regarding the TelexFree fraudulent scheme, Montalvo along with Cardenas continued to advocate for Wanzeler, Merrill and TelexFree and provided information requested including additional reports on John Merrill. In this regard, in prepare for a call between Cardenas and Pisan about the matter, Montalvo advised Cardenas on February 4, 2014 to "Make sure he understands that what TelexFree is accused of in Brazil has nothing to do with the US and they have never been accused of in the US. We can't hold Jim Merrill accountable for what happens with Telexfree in Brazil"

303.    As another example,  or about February 7, 2014 Montalvo drafted an email for management which summarized his and Cardenas 's  interactions with Merrill and  Craft, who

assured them that funds are not being funneled in from Brazil; that, "the client's long term business relationship at Bank of America was closed in April of 2013 due to a misunderstanding on BOA's part that has since been corrected, and that due to the misunderstanding with BOA, Telexfree began banking relationships with other financial institutions, including Wells Fargo. Montalvo went on the explain that he and Cardenas won their business and were able to beat out these firms based in Boston. He further wrote that he and Cardenas have spent many hours to develop their relationship with Telexfree. Various financial documents are attached to this email, including a letter written by Craft where he stipulates that the brokerage accounts were opened last year and the funds used to open those accounts came from the United States, not Brazil. Montalvo then asked that Wells Fargo not request any more corroboration documents from the client and asks that the management personnel fly to Boston to thank them for their business and learn more about them. He notes the possibility of expanding the business relationship to include things such as estate planning. Montalvo ultimately circulated the email to WFB management.

304.    Montalvo also requested a Final Investigative Report on TelexFree Inc. and repeatedly communicated with WFB management to convince them to open WFB accounts for TelexFree, Wanzeler and Merrill.

305.    Thus, it is undisputed, that Michael Montalvo carried out a subsequent equally thorough account opening including engaging in a Wells Fargo standard KYC investigation and other investigations during or early than January 7, 2014 and after. The results were shared or otherwise available to both Wells Fargo Bank and Wells Fargo Advisors and that during that investigation he learned and reported that TelexFree's parent company, Ympactus was found to be a pyramid scheme and shuttered by Brazilian authorities.

306.    Thus, the combination of Red Flags and public information known to both WF

Bank and WF Advisors beginning at least in April 2013 and no later than December 2013, and confirmed again in early January 2014, combined with the insider knowledge of Montalvo and Cardenas, and documentation of the standard results whenever TelexFree applied for a new Wells Fargo account overwhelmingly establishes that WF Bank and WF Advisors knew that TelexFree was a fraudulent pyramid/Ponzi scheme and that Montalvo had undisputed knowledge by early January 2014 if not before.

307.    Despite this, Montalvo, Cardenas, WFB and WFA continued to support, aid and abet TelexFree and its principals.  On or about February 18, 2014 WFB finally admitted that TelexFree posed an undue AML risk and advised Montalvo and Cardenas to cease doing business with TelexFree and its agents and principals and yet did nothing to close or suspend the numerous WFB accounts that were opened.

308.    As set forth below, even with this additional knowledge and clear direction, Montalvo and Cardenas continued to aid and abet TelexFree and its agents and principals by opening accounts and providing essential banking services including wire transfers.

### b.    Summary of Substantial Assistance

309.    Given the long period that they extended banking privileges to the pyramid scheme, Wells Fargo Bank and Wells Fargo Advisors directly and through the actions of Cardenas and Montalvo provided TelexFree with essential and substantial assistance in a variety of ways. They opened many accounts for the same TelexFree related entities and individuals effectively disbursing the number of suspicious activities and red flags associated with a single account holder and made money laundering and layering easy by accepting, transferring, or intermingling victim funds between or among TelexFree related entities and individuals accounts. They did the same by creating WF Bank offshore accounts and also by transferring funds to non-related offshore accounts. The last exemplar of the substantial assistance provided was the acceptance in,

intermingling and transfer out of large, anomalous sums of the victims' funds at times when it and other Banks had terminated or suspended related banking privileges.

310.    Also, at this time, Montalvo and others, at Montalvo's request, wrote glowing letters of recommendation that facilitated TelexFree opening offshore accounts that were quickly used shelter victim's funds. Wells Fargo did not hold or suspend accounts holding victim funds after fraud was detected and the heat was on, rather they released the funds in the form of easily negotiated cashier's checks.

311.    At times material herein, despite having knowledge that TelexFree was a fraudulent enterprise carrying out suspicious, tortious, unlawful, unfair or deceptive acts or practices and that Wanzeler's funds were illegally obtained, WF Bank, WF Advisors, Cardenas, and Montalvo performed substantial and integral services and provided essential assistance that were used to further TelexFree's unlawful business and to enable Wanzeler and TelexFree to hide and invest assets and launder illicit monies derived from TelexFree's illegal activities and provided TelexFree with unfettered access to banking, financial and investment services that were used to further Wanzeler's and TelexFree's unlawful business.

312.    Cardenas was an indispensable advisor to and co-conspirator with Wanzeler and TelexFree and worked together with Montalvo in his efforts to aid and abet.  Cardenas developed and fostered a close, personal and business relationship with Wanzeler throughout periods relevant to the complaint by making sure the substantial contributions he and Wells Fargo Advisors and Wells Fargo Bank made were indispensable.  Cardenas and Montalvo worked together and were at times the mechanism through which Wanzeler and TelexFree were able to transfer, hide, and invest funds unlawfully obtained through TelexFree's illegal operations and continue to keep TelexFree's illegal operations hidden from the authorities and investors. Through this assistance,

TelexFree LLC was able to continue operating its Ponzi scheme with innumerable high value wire transfers, debits, and credits between accounts and to vendors and from payment processors. Without his assistance, the scheme would have collapsed.

313.    During these interactions, Cardenas and Wanzeler willfully and knowingly put their own financial interests and that of TelexFree ahead of the victims.  They conspired to illegally maximize profits, hide assets, launder illicit monies and place unlawful profits derived from TelexFree's illegal activities for Wells Fargo Advisors and Wells Fargo Bank.  Importantly, the services provided by Cardenas and Wells Fargo Advisors were essential to the growth of their own careers or fortunes and that of TelexFree.

314.    In exchange for their substantial contributions, Defendants derived substantial income from their services to TelexFree and Wanzeler and their actions were the direct and proximate cause for each member of the putative class to similarly suffer ascertainable economic harm.

### c.    Wells Fargo Continued Role as a Depository and Acquiring Bank Provided TelexFree's Scheme with Substantial Assistance

315.    During mid- 2013 and through to the FBI raid and shuttering of TelexFree in 2014, a remarkable number of banks, both big and small, closed TelexFree accounts due to fraud-related activity. The ranks include Synovus Bank, Bank of America, N.A., TD Bank, N.A., Citizens Bank, and eventually even Fidelity Bank headed by Merrill's brother. Sovereign Bank, The Commerce Bank and others entirely rejected TelexFree's merchant applications and requests for financial services

316.    Beginning in or about September 2013, WFB also acted as acquiring bank for Bank Card Consultants ("BCC") in its processing for TelexFree. This occurred in the wake of the shuttering of TelexFree's Brazilian parent Company Ympactus. During this time banks and pay

processing companies were threatening to and did close accounts and reduce processing services. By agreeing to become an acquiring bank at this precise time, Wells Fargo Bank gave TelexFree what it needed to sustain its operations – access to an acquiring bank that would accept, process and place into its control, the payments made to it by its victims.

317.    Even as other financial institutions stopped doing or refused to do business with TelexFree and its managers and associates, TelexFree moved a substantial portion of its banking business to Wells Fargo who continued to provide it with ever increasing disbursed ACH access. This of course substantially contributed to TelexFree's ability to continue its operations and accept, launder and shelter Victim funds without government enforcement. As referenced in the exemplar transactions below, easily detected white-collar financial fraud techniques were employed and thus required the willful participation of Wells Fargo.

318.    It also opened two other accounts for "JC Real Estate Management," an entity named after, and known to be affiliated with James (Merrill) and Carlos (Wanzeler).

319.    Wells Fargo Bank further substantially assisted TelexFree's enterprise, including related coconspirators, by transferring tens of millions of dollars overseas and out of the reach of the United States justice system. Each transfer comingled victim funds into the accounts of TelexFree shell companies, its executives' individual accounts, or related accounts.

320.    Beginning no later than December 2013, Cardenás assisted TelexFree with having accounts approved by WFB.

321.    Thereafter, TelexFree began transitioning the bulk of its banking over to WFB. From December 2013 through February 2014, TelexFree made numerous multi-million-dollar transfers into its multiple WFB accounts many with the assistance of Michael Montalvo.

322.    For example, in December 2013 Cardenás made a "cross-sell" that helped Carlos

Wanzeler successfully apply for deposit accounts with Wells Fargo Bank. Specifically, Cardenas and Lighthouse Point, Florida Wells Fargo banker Wendy Flores handled the application and opened these two additional TelexFree Financial, Inc. deposit accounts.

323.    At the time, Cardenas and Flores knew that TelexFree Financial, Inc. had no employees and had been created as a conduit for paying the employees of TelexFree, LLC and TelexFree, Inc., because those entities were having problems with banks. The creation and servicing of the account provided TelexFree with substantial assistance because without them, TelexFree would have been unable to meet payroll responsibilities and thus been forced to close. On the account, Carlos Wanzeler is listed as the owner of TelexFree Financial, Inc. The two accounts were opened with numbers ending in 4252 and 3387. Wanzeler also opened two accounts for himself ending in 6171 and 4009.

324.    Defendant Montalvo was no doubt aware of these account openings as he assisted with transactions involving these accounts despite his knowledge of the TelexFree fraud.

325.    The importance of TelexFree's relationship with WFB cannot be understated. On or about the same time, Wanzeler transferred $3,800,000.00 from Fidelity Bank to Wells Fargo Bank. On or about the same date, Fidelity Bank made three more transfers totaling more than $305,000 to Wells Fargo Bank. In context, TelexFree had been forced out of Fidelity Bank for suspected financial fraud, Wells Fargo had actual knowledge of this and the fact that TelexFree could not find another bank to take the transfer prior to accepting the funds. Thus, Wells Fargo Bank substantially assisted TelexFree place the funds, launder and eventually shelter them.

326.    TelexFree found itself under increasing pressure at the beginning of 2014.  On January 2, 2014, EverBank turned down Carlos Wanzeler for a bank account application due to inability to verify his identity or his social security number, residence, or business.   This and

decisions by other banks to not do business with TelexFree squeezed TelexFree even further to find a dependable banking partner.

327.    About the same time that EverBank rejected Wanzeler's application to open an account on January 2, 2014, on January 7, 2014, Defendant Michael Montalvo, Vice President and Wealth Advisor for Wells Fargo Private Bank, performed a background check on Carlos Wanzeler which again confirmed what it already knew: Wanzeler and Merrill's association with TelexFree, and that TelexFree was a massive pyramid scheme that had already been shuttered in Brazil. Also providing important context, during January 2014, while acting as a jointly authorized representative for both entities, Cardenás unequivocally told Joseph Craft that Wells Fargo Bank and WF Advisors were concerned with negative publicity calling TelexFree a pyramid scheme. Cardenas specifically mentioned that this concern was raised by John Pisan, the Regional Managing Director of Wells Fargo Bank, in Orlando, Florida.

328.    Immediately thereafter, on January 29, 2014, Wells Fargo Bank provided TelexFree with additional and substantial assistance by permitting it to deposit another "impossible to place at the time" $1,000,000 into the Wells Fargo Bank account, this time the one ending in 6723 (opened in April of 2013).

329.    Beginning in February 2014, TelexFree was under hot and active investigation by the COMSOC and was otherwise out of options and unable to find US based banks to service its accounts. Wells Fargo Bank provided TelexFree, LLC with substantial assistance by opening five more new deposit accounts (ending in 7089, 8506, 6810, 6786 and 8498).

330.    Montalvo is identified as the relationship manager for account 7089.

331.    The purpose of these numerous bank accounts was to make TelexFree's money laundering and offshoring activities more difficult to trace.

332.    Also beginning in February 2014, Cardenás became a key part of TelexFree's international expansion plans. TelexFree utilized Cardenás to open international bank accounts in accordance with the planned international expansion devised by Merrill, Wanzeler, Babener, PwC, and the attorneys at Garvey Schubert.

333.    On February 14, 2014, the legal team of Garvey Schubert, Babener, and Nehra and PwC's foreign enterprise and sheltering team including Puzey and Colabella advised that relocating TelexFree's operations offshore, possibly to Nevis, would "remove foreign revenue out of US regulatory jurisdiction. This general advice was greatly expanded soon after. Also, and as is later detailed, a related action took place on February 24, 2014 when Wells Fargo Bank opened two accounts for Katia Wanzeler as part of a "PMA Package." In sum, this account was later used as a conduit to launder money and transfer funds to an offshore sheltering account.

334.    On February 19, 2014, Michael Montalvo – despite the fact that his background check on TelexFree just over a month earlier had referred to the company as a "*fraude*" –provided TelexFree with substantial assistance via a letter of recommendation on Wells Fargo letterhead for TelexFree and Wanzeler, stating that both "had a great history" with Wells Fargo, they had "managed their relationship with Wells Fargo in a consistent and satisfactory manner" and that he had known both Wanzeler and TelexFree "personally for over a year and [found] them to be of great character." At the time Montalvo wrote the letter of recommendation he knew it would be used by TelexFree in its defense during the investigation by the Massachusetts Securities Division.

335.    Mr. Montalvo's own background investigation a month earlier revealed that TelexFree was a massive pyramid scheme shuttered in Brazil, and that both Wanzeler and Merrill were affiliated with and implicated in the scheme. Montalvo's letter of recommendation and personal support of Wanzeler and TelexFree on behalf of Wells Fargo far exceeded routine

banking services and elevated the Wells Fargo Defendants to willful accomplices seeking to profit from the illegal enterprise.

336.    Rather than proceed with terminating the remainder of TelexFree's business, WFB kept the remaining TelexFree accounts open, and transferred the balance of the closed accounts to another WFB account. On or about the same day, Cardenás also arranged for WFB to open another TelexFree, LLC checking account with a deposit of almost $5.5 million

337.    On February 24, 2014, at the request of Montalvo, Amine Radi, a Vice President at Wells Fargo Bank, wrote another letter vouching for TelexFree, LLC, stating that TelexFree (and "related companies") had an "established banking relationship" and was "one of our better clients."

338.    Both letters of recommendation gave TelexFree "a veil of legitimacy" and allowed TelexFree to trade on the Wells Fargo name, weight and connections in order to boost TelexFree's credibility with third parties and continue preying on investors.  TelexFree, LLC, and Wanzeler used the letters to, among other things, secure banking and/or payment processing services from third parties.  Within days of Ms. Radi's letter, payment processor Allied Wallet Ltd. initiated two wire transfers, one for $7,827,339.69 and the other for $170,786.19, for deposit into TelexFree, LLC's Wells Fargo account no. ending in 7089. This close timing evidences the fact that Ms. Radi's letter gave Allied Wallet whatever assurances it needed to make these deposits.  This also bears directly on the nature of Wells Fargo's substantial assistance because the funds that Allied Wallet deposited into TelexFree, LLC's Wells Fargo account consisted of victim credit card payments into the TelexFree Pyramid scheme.

339.    The very next day, on February 25, 2014, funds were wired into TelexFree's Wells Fargo Bank Account no. 7089 from Allied Wallet per the instructions of Carlos Wanzeler.

340.    Importantly, as of this time, Montalvo was identified as the Relationship Manager for WFB account 7089.  Furthermore, additional deposits totaling over $300,000 were made into this same account on February 25, 2014.

341.    Also on February 25, 2014, Wells Fargo permitted TelexFree to make a deposit in the amount of $5,400,000 into the Wells Fargo account ending in 8498. A WF Bank management level employee approved the deposit. The transaction fell far outside the Customer Profile that Wells Fargo Bank had assigned TelexFree and came at a time when TelexFree had accounts being terminated. Wells Fargo Bank provided TelexFree with substantial assistance both by providing service when all else were terminating relationships and by placing into a safe account it controlled over five million dollars of victim funds. Those funds were eventually moved offshore and sheltered. But for those, and a handful of other accounts, TelexFree would have collapsed under its own weight and been shuttered.

342.    On February 25, 2014, Wells Fargo Bank closed two of the TelexFree, LLC, accounts that it had opened in April 2013 (account nos. 6723 and 0264).   When the Massachusetts Securities Division later interviewed Carlos Wanzeler, he blamed the subpoenas served by the Division for Wells Fargo's account closings:

> Because the banks and that's the biggest problem we have today, when they hear – like I tell the true, guys, when they hear we have a subpoenas here, I just lost Wells Fargo; Now Wells Fargo doesn't want to do business with us because have subpoenas today.  I know that's not you guys' problem, but that's what happened to our company today.

343.    On or about the same day, Wells Fargo Bank opened TelexFree, LLC checking account no. 8498 with a $5.468 million deposit made in a Wells Fargo branch.  Cardenas assisted TelexFree with opening this account.

344.    Wells Fargo's bank account applications listed Carlos Wanzeler as one of

TelexFree, LLC's two owners. They also held joint Wells Fargo accounts. This information flagged Wanzeler's wife, Katia Barbosa Wanzeler, who received large transfers out of TelexFree's bank accounts, as a person related to TelexFree.

345.    At this same time in February 2014, WFB had also opened two personal accounts for Katia Wanzeler, which were used for siphoning and concealing funds. These accounts were opened as part of the PMA package which included also a brokerage account with WF Advisors (account no. 3207) naming Cardenas as her advisor and a high yield savings account (account no. 3716). On February 28, 2014, just three days after closing the above WFB accounts (nos. 6723 and 0264), two transfers from the newly opened account no. 8498--one for $1,000,000 and the other for $2,500,000—were made into Katia Barbosa Wanzeler's personal Wells Fargo savings account no. 3716. It is important to note that the source of the transfer was victims' funds held by TelexFree, LLC in its corporate account and each of these transfers was approved by Montalvo.

346.    Within days, on March 3 and March 6, 2014, respectively, Wells Fargo transferred $1,499,986.74 of those funds electronically from Mrs. Wanzeler's savings account no. ending in 3716 to her Wells Fargo brokerage account no. ending in 3207. In this way, Wells Fargo, through the acts of Cardenas and Montalvo, used its bank accounts in tandem with its Wells Fargo Advisors brokerage accounts to launder TelexFree, LLC's illicit proceeds thus providing TelexFree with the substantial assistance it required to place, layer, otherwise launder and eventually shelter the victims funds beyond their reach.

347.    Thus,    Wells    Fargo    Bank    knowingly    intermingled victims' funds totaling $3,500,000 that had been held in a TelexFree, LLC corporate account into Katia Wanzeler's personal Wells Fargo savings account. These laundering and layering transactions were unlawful    as    well    as essential    for the    subsequent transfer of    the victim's funds

to offshore accounts out of the reach of United States authorities.

348.    During early 2014, TelexFree's Wells Fargo bank account statements showed suspicious multi-million-dollar deposit inflows as TelexFree funds flooded from other banks and payment processors into certain TelexFree, LLC, accounts.  These inflows included:

    a.  a $5.4 million deposit on February 25, 2014, into Wells Fargo account no. ending in 8498;

    b.  a $7,827,359.69 deposit and a $170,806.19 deposit by Allied Wallet on or about February 27, 2014, into Wells Fargo account no. ending in 7089;

    c.  an $8,251,564.76 deposit and a $146,632.36 deposit by Allied Wallet on or about March 5 or 6, 2014, into the same account (account no. ending in 7089);

    d.  a series of large deposits into Wells Fargo account no. ending in 8506:

    e.  a $2 million deposit labeled "Commissions" on March 4, 2014;

    f.  another $2 million deposit labeled "Commissions" on March 13, 2014; and

    g.  a $30 million deposit wired from International Payout Systems, Inc., on March 17, 2014.

349.    These enormous inflows of cash into TelexFree, LLC's accounts triggered immediate red flags that Wells Fargo's automated surveillance systems tracked. This again established the obvious. Wells Fargo bank possessed actual knowledge.

350.    At the time it all other banks were terminating TelexFree, Wells Fargo became its go to bank of first resort and the level of transactions of course provided TelexFree with the substantial assistance it needed.

351.    On February 27, 2014, Allied Wallet made two wires transfers totaling $7,970,000 into TelexFree, LLC's Wells Fargo account ending in 7089.

352.    That same day, additional funds were wired into TelexFree's Wells Fargo Bank Account no. 7089 from Allied Wallet per the instructions of James Merrill.

353.    No other United States bank would accept TelexFree as a customer or these funds and its existing banks were also advising them, they would not be servicing them going forward.

354.    There is no reasonable doubt that by the time of the aforementioned significant and anomalous transfers that Wells Fargo management had made conscious decision to open these accounts, capture the victim's funds and place them into the control of TelexFree, LLC thus providing substantial assistance to TelexFree's ongoing unlawful MLM.

355.    Other red flags were present. Two of the TelexFree, LLC, accounts also had multimillion-dollar outflows in February and March 2014 indicative of layering and integration. Account no. ending in 8506 showed $33 million in total debits one month (including a bank originated debit of over $15 million) and account no. ending in 8498 had bank originated debits totaling $3.5 million over that period.  Three of the four accounts (nos. ending in 7089, 8506, and 8498) had been newly applied for or opened in late February or early March 2014.  By definition, the bank originated debits were initiated by Wells Fargo Bank, N.A., itself and no stated payees were named in the account statements.  These debits were a telltale sign of money laundering and evidenced actual participation by Wells Fargo in the moving of illicit funds.

356.    As referenced earlier, during February and March of 2014, Joseph Craft conferred with Richard Colabella, Sara Sanford, Jerry Puzey, Gary Tober and Jeffrey Babener, wherein they recommended establishing a foreign base of operations for TelexFree in Grand Cayman, On February 27, 2014, Puzey personally suggested that TelexFree expand into places such as the Caymans, the Netherlands, or Luxembourg. The express purpose for this international expansion was to allow TelexFree to avoid regulatory intrusions into its business operations by governmental

agencies and to shelter significant revenue from taxes. TelexFree thereafter utilized Cardenas, its advisor and Wells Fargo insider, to open international bank accounts in accordance with the planned international expansion

357.    By helping TelexFree locate and establish bank accounts, including efforts to open international accounts, Cardenas, Monalvo, Wells Fargo Bank and Wells Fargo Advisors substantially assisted TelexFree's illegal pyramid scheme and became key collaborators in assisting TelexFree with laundering and sheltering victims' funds.

358.    On or about March 3, 2014, on Tober's, Sandford's, Puzey's, and Colabella's suggestion, Craft again asked Cardenas to establish a bank account in Grand Cayman for purposes of offshoring TelexFree's merchant processing and funds, using an entity that Sandford had established in the Caribbean as the account holder. Mauricio Cardenas did establish Wells Fargo Bank accounts for processing international transactions.

359.    On March 3 and March 6, 2014, respectively, Wells Fargo transferred $1,499,986.74 of the funds in Mrs. Wanzeler's savings account no. 3716 to her Wells Fargo brokerage account no. ending in 3207.  The money originated as victim funds, were passed through TelexFree's corporate accounts, landed in Katia Wanzeler's personal accounts and were eventually furthered laundered, layered and/or sheltered. The Katia Wanzeler transactions were otherwise an important component of TelexFree's unlawful enterprise for many reasons. As Katia Wanzeler was the wife of Carlos Wanzeler, she was flagged as a person related to TelexFree by Wells Fargo's sophisticated systems. She was a known associated person clearly establishing that Wells Fargo Bank was a knowing accomplice. Furthermore, email correspondence confirms that both Cardenas and Montalvo knew that Katia Barbosa was in fact Karia Wanzeler.

360.    On March 4, 2014, Wells Fargo Bank opened yet another new checking account

for TelexFree, LLC, ending in 8506.

361.    On March 6, 2014, Allied Wallet transferred $8,200,000 into TelexFree, LLC's Wells Fargo Bank account no. 7089. Cardenas was involved in facilitating each of the above transactions.

362.    Upon information and belief, on or around March 12, 2014, two days before TelexFree announced its unilateral change to the standard form TelexFree contract and compensation plan, the total TelexFree cash balance at Wells Fargo was approximately $16,970,000.00.

363.    On Friday, March 14, 2014, Craft conferred with Cardenas, who assured Craft that he was working directly with another representative at Wells Fargo Bank in an effort to open accounts for TelexFree's Grand Cayman corporation. They discussed TelexFree's financials and Cardenas requested, and Craft agreed to provide, TelexFree's 2013 financial records. Cardenas indicated that this would satisfy Wells Fargo Bank and anticipated that an account would be established the coming Monday. All the while, additional unlawful TelexFree account activity continued and expanded at Wells Fargo.

364.    On March 17, 2014, TelexFree made a $30,000,000 deposit from International Payout Systems, Inc., into a Wells Fargo Bank account ending in 8506.[3] Once again, Wells Fargo Bank stepping up provided TelexFree's unlawful MLM with substantial assistance because no other bank would touch this thirty million dollars due to BSA/ALM prohibitions and reporting requirements.

365.    No later than March 19, 2014, Wells Fargo possessed actual knowledge that the Massachusetts Securities Division had issued subpoenas on TelexFree. This supplemented their prior actual knowledge about earlier subpoenas.

366.    When TelexFree became concerned that the investigation into TelexFree was hurting its relationship with Wells Fargo, James Merrill reached out to Cardenas again to help.  On March 20th, 2014 at 12:54 pm, James ("Jim") Merrill emailed with Stuart MacMillan, Interim CEO, TelexFree and Mauricio Cardenas, Financial Advisor, Wells Fargo Advisors introducing the men to each other and discussing the issues with the banking relationship between TelexFree and Wells Fargo. This resulted in a face to face meeting and thereafter Wells Fargo Bank continued to service TelexFree which continued until TelexFree declared bankruptcy April 2014.

367.    Notwithstanding Wells Fargo's closure of accounts no. ending in 6723 and 0264, Wells Fargo took no action to close the other two April 2013 WF Bank TelexFree Accounts. Instead, it kept them open.  When Wells Fargo closed TelexFree, LLC, account no. ending in 6723, it transferred the balance to one of the other two original TelexFree, LLC, accounts, the one ending in 6715, at Wells Fargo.  Similarly, when Wells Fargo closed account no. ending in 0264, it transferred the balance to the same TelexFree, LLC, account no. ending in 6715.

368.    Banking industry and regulatory standards make clear that once an account, especially an MLM account, is closed due to suspicion of fraud, all related accounts and further banking services to that customer should be terminated.  Wells Fargo Bank had this very policy, which we can see from the notices that it sent to TelexFree, LLC later on when the Bank finally announced it was terminating TelexFree, LLC's banking relationship for good.  In those notices, dated March 25, 2014, the Bank's Risk Operations and Fraud Prevention Services unit informed TelexFree, LLC:  "Effective immediately, the Bank will not open any new bank accounts for TelexFree, LLC and will not accept any additional deposits into the Closing Accounts." Nevertheless, Wells Fargo ignored its own policy when it kept the other two original TelexFree, LLC, accounts open on February 25.

369.    Remarkably, Wells Fargo Bank willfully expanded its services for TelexFree and actually increased its level of support after it closed the two accounts due to the Massachusetts investigation on February 25. On March 4, 2014, Wells Fargo opened yet another new checking account for TelexFree, LLC, no. ending in 8506. Wells Fargo Bank continued to service multiple other TelexFree accounts after closing the two accounts due to the Massachusetts' investigation into securities fraud.

370.    In late March 2014, Wells Fargo Bank temporarily froze transfers on one of TelexFree's accounts. However, with the assistance of Cardenas, the restrictions on these accounts were later lifted and Wells Fargo Bank continued to service TelexFree until at least April 11, 2014. Wells Fargo's own policies, along with banking industry and regulatory standards, provide that once an account is closed due to suspicion of fraud, all related accounts and further banking services to that customer should be terminated.

371.    On or about March 25, 2014, Montalvo was put on administrative leave.

372.    On March 25, 2014, two letters addressed to TelexFree, LLC, from Cindy Watson, a Financial Crimes Analyst with Wells Fargo Risk Operations and Fraud Prevention Services at Wells Fargo Bank, stated that Wells Fargo Bank was terminating its banking relationship with TelexFree, LLC.  The letters further stated that Wells Fargo Bank would close seven TelexFree, LLC's bank accounts effective April 9, 2014 (nos. 8498, 8506, 6786, 6810, 6715, 0272, and 7089).

373.    Upon information and belief, as of April 7, 2014, the total TelexFree cash balance at Wells Fargo was approximately $29,000,000.

374.    Less than a month after it was opened TelexFree account no. 8506 showed $33 million in total debits one month (including a bank originated debit, meaning that it had no

specified payee, of over $15 million) and account no. 8498 had bank originated debits totaling $3.5 million over that period. This was in no way consistent with its Merchant Profile. Wells Fargo was compelled by BSA/ALM requirements to suspend TelexFree's accounts and freeze all funds. It did not. Rather it kept providing substantial assistance.

375.    On April 10, 2014, Wells Fargo Bank allowed TelexFree Financial, Inc., to wire $3.5 million from its account ending in no. 1813 to the law firm Greenberg Traurig

376.    On April 11, 2014, Wells Fargo Bank did not follow through on the representation made in its March 25, 2014 letters and Wells Fargo Bank's and stop servicing TelexFree. Rather, despite its prior actions and statements establishing its actual knowledge of TelexFree's fraud, Wells Fargo Bank continued to provide TelexFree's unlawful enterprise with additional substantial assistance. In fact, Wells Fargo Bank unlawfully issued James Merrill and Katia Wanzeler nine cashier's checks totaling $27,550,296.66. The funds belonged to TelexFree's victims.

377.    Shortly thereafter, on Tuesday, April 15, 2014, law enforcement raided TelexFree's headquarters. At that time, it was discovered that Wells Fargo Bank had also made another huge disbursement of the Victims funds - a cashier's check made out to TelexFree Dominicana SRL, for $10,398,000 – to Carlos Wanzeler on April 3, 2014.

378.    On that same day Cardenas was terminated by Wells Fargo.

    **d.    Montalvo Provided Additional Substantial Assistance to TelexFree**

379.    In addition to the foregoing, Michael Montalvo, often working together with Mauricio Cardenas, was instrumental to TelexFree's unlawful enterprise by assisting in wire transfers, deposits and credits to and from TelexFree, LLC's Wells Fargo Bank accounts.  Some examples follow.

380.    On January 17, 2014, there is a Bank originated Credit of $500,000 made to WFB

Telexfree LLC account ending in x0264 from a different WFB TelexFree account which was originated by WFB employee Inna De Jesus and approved by Montalvo.

381.    On January 24, 2014, Montalvo was requested by email to assist and did assist with wiring $300,000 in funds from the TelexFree Financial Inc. acct. 3387 to three Telexfee LLC WFB accounts as follows: a) $100,000 to 0272; b) $100,000 to 6723 and c) $100,000 to 6715. The bank statement associated with this account shows that the deposits were then completed.

382.    Also on January 24, 2014, Michael. Montalvo was requested to by email to assist and did assist with wiring from Telexfree LLC x0264, $500,000.00 to Telexfree LLC x0272. After receiving this email for th request Michael Montalvo took steps to initiate and finalize the transfers which were completed on the same day.

383.    On January 28, 2014, TelexFree insider Moreira sent an email to Cardenas and Montalvo and included James Merrill and Carlos Wanzeler for another wire of $390,000 from TelexFree LLC account 0272 to Craft Trust Services, LLC.  Further emails involving Craft, Cardenas and Moreira indicate that a cashiers' check in the same amount was then requested. Cardenas then requested Montalvo's help regarding the $390,000 cashier's check to be paid to Joseph Craft Trust Services, LLC. Montalvo then took steps to ensure that the check would be sent overnight which resulted in a Bank Originated Debit of $390,000 on 2/4/2020 from account 0272.

384.    On February 4, 2014, Moreira emailed Montalvo and Cardenas asking for a transfer of $500,000.00 from Telexfree Financial INC, account ending in x3387, to Telexfree LLC, account ending in 0272. At 10:51 a.m., Montalvo forwarded the email to WFB employee, DeJesus and directed her to complete the transaction. The transaction was completed the funds were available at midnight.

385.    On February 5, 2014, Andreia Moreira emailed Montalvo and Cardenas regarding

an international wire transfer from TelexFree LLC account 0272 to Banco Santander for the benefit of Editora Globo S/A in the amount of $174,684/85 to which Cardenas replied "sim, pefeito". Montalvo intervened and asked WFB employee Manning to rush the wire and to let him know whether they need the client to verify or sign the transaction Manning responds stating that they have contacted the client and were initiating the wire. Montalvo then asked that she send the reference number to the client once the transaction was complete. On 2/6/2014 there was a wire transfer of 174,684.65 to Banco Santander for Ediora Globo S.A. Again, Montalvo then took steps to ensure the transfer was completed through direction to WFB employees.

386.    As set forth previously, on February 19, 2014, Michael Montalvo provided TelexFree with substantial assistance via a letter of recommendation on Wells Fargo letterhead for TelexFree and Wanzeler, stating that both "had a great history" with Wells Fargo, they had "managed their relationship with Wells Fargo in a consistent and satisfactory manner" and that he had known both Wanzeler and TelexFree "personally for over ayear and [found] them to be of great character."

387.    On February 24, 2014, Cardenas of WFA and Montalvo of WFB facilitated getting an additional letter of reference for TelexFree this time from Amine Radi of WFB.   Montalvo emailed Mr. Radi requesting he write a "generic letter with no specific information, to whom it may concern, stating that Telexfree has a banking relationship with Wells Fargo and if they have any questions they can call you." Montalvo went on to write that because they were not located in the Boston area, some of Telexfree's vendors may require such a letter.  Montalvo asked Radi to send the letter directly to Moreira at TelexFree.  Amine Radi provided the letter which states that TelexFree, LLC and its related companies have an established banking relationship with Wells Fargo Bank and that Wells Fargo considers TelexFree one of their better clients.

388.    On February 26, 2014, WFB and WFA opened a PMA Account for Carlos Wanzeler's wife, Katia H. Barbosa (Wanzeler) which included a checking and savings account with WFB and a brokerage account with WFA (PMA Premier Checking Account #8034; Wells Fargo High Yield Savings Account #3716; Standard Brokerage 3207).  The initial deposits to the WFB savings account from a transfer of $3,500,000 (by way of two checks— one for $1,000,000 and one for $2,500,000) from TelexFree's WFB account # 8498 were approved by Michael Montalvo.  More specifically, on February 28, 2014, WFB issued four checks to make the transfer happen, all approved by Montalvo: 1) "Customer Account Deposit Notice - CREDIT", Account # ending in 3716, Approved by Montalvo for Customer Katia Barbosa Wanzeler $1M; 2) "Customer Account Charge Notice – DEBIT, Account # ending in 8498, Approved by Montalvo  for Customer Telexfree LLC, $1M, 3) "Customer Account Charge Notice – DEBIT", Account # ending in 8498, Approved by Montalvo for Customer Telexfree LLC, $2.5M; 4) "Customer Account Deposit Notice – CREDIT" Account # 3716, Approved by Montalvo for Customer Katia Barbosa Wanzeler.

389.    In addition, in the process of making the above transfers, Montalvo communicated with Carlos Wanzeler regarding the transfers from the TelexFree accounts.

390.    Later, in February and March 2014, long after Montalvo was told not to do business with TelexFree, Wanzeler and Merrill and long after he knew TelexFree was a fraud, Montalvo received by Federal Express Overnight Shipments from Carlos Wanzeler containing numerous checks and money orders which included checks and money orders from victims in the $1425 amount and checks from vendors, totaling hundreds of thousands of dollars, many dating back to December 2013. Upon information and belief, these funds were deposited with the help of Montalvo, into TelexFree WFB accounts and enabled the continued operation of the TelexFree

Scheme.

391.    As described above, TelexFree eventually collapsed under the weight of its obligations and filed for Chapter 11 bankruptcy on April 14, 2014. The next day, on April 15, 2014, federal agents executed three search warrants, including one at TelexFree's headquarters in Marlborough, Massachusetts. During that search, a law enforcement officer intercepted TelexFree's Chief Financial Officer, Joseph Craft, attempting to walk out with a laptop and a bag. Inside the bag were ten cashier's checks drawn on Wells Fargo Bank, N.A., totaling $37,947,443.28. Eight of the checks were dated April 11, 2014 and were remitted to James Merrill. Of those eight checks, five checks totaling $25,548,808.52 were payable to TelexFree, LLC. A ninth check dated April 3, 2014 and remitted to Carlos Wanzeler, was made out to TelexFree Dominicana SRL for $10,398,000. The tenth, dated April 11, 2014, was made out to Wanzeler's wife in the name of "Katia B Wanzeler," for $2,000,634.76.

392.    Montalvo served as a valuable conduit to TelexFree by arranging and providing many of the Wells Fargo banking services necessary for TelexFree to facilitate its illegal operations. In so doing, he along with Cardenas, Wells Fargo Bank, and Wells Fargo Advisors, LLC, lent substantial assistance to TelexFree, the Wanzelers, and others associated with TelexFree's wrongdoing. These activities, described above included lining up Wells Fargo accounts; serving as an advisor and advocate; processing transfers of investor funds and providing TelexFree access to the international payment system; allowing participants' funds to be transferred into the personal accounts of TelexFree's principals; providing TelexFree with positive reference letters; and assisting TelexFree with its international expansion, all while knowing of the suspicions surrounding TelexFree's fraud. In the process, Cárdenas and Montalvo knowingly helped TelexFree hide its illicit funds derived from its defrauded investors and helped Wanzeler

and his wife, Katia Barbosa Wanzeler, launder, hide, or otherwise wrongfully move millions of dollars.

393.    Throughout this time, Montalvo worked in concert with Cardenas.

## CLASS ACTION ALLEGATIONS

394.    Under Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs sue on their own behalf, and on behalf of all other persons similarly situated ("the Class").  The Class that Plaintiffs seek to represent is:

> All persons residing in the United States who purchased TelexFree AdCentral or AdCentral Family packages and suffered a Net Loss[2] during the period from January 1, 2012 to April 16, 2014 (the "Class Period").

395.    Excluded from the Class are Defendants and their officers, directors, and employees; any entity in which any Defendant has a controlling interest; the co-conspirators, the so-called Top-Level Promoters, legal representatives, attorneys, heirs, and assigns of Defendants.

396.    Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because the members of the Class are so numerous that the joiner of all members is impractical.  While the exact number of Class members is unknown to Plaintiffs, it is in the hundreds of thousands.

397.    Plaintiffs meet the requirements of Federal Rules of Civil Procedure 23(a) because there is a well-defined community of interest among the members of the Class, common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the Class, and Plaintiffs can fairly and adequately represent the interests of the Class.

398.    This action satisfies the requirements of Federal Rule of Civil Procedure 23(b)(3) because it involves questions of law and fact common to the members of the Class that predominate or questions affecting only individual members, including, but not limited to:

---

[2] "Net Loss" is defined as the class member having invested more funds than they withdrew.

a.  whether the contract under which TelexFree operated is illegal and unenforceable as a matter of law;

b.  whether TelexFree's claim to invoke the application of Nevada law is enforceable;

c.  whether TelexFree ran an unlawful Pyramid Scheme or a legitimate business;

d.  whether TelexFree ran a lawful MLM program or an unlawful pyramid scheme;

e.  whether Defendant knew that TelexFree was an illegal Pyramid Scheme, yet continued to aid, abet and further such illegal activities or are otherwise liable for the economic loss suffered by the Putative Class;

f.  whether the aid that each Defendant provided was a substantial in the context of aiding and abetting;

g.  was TelexFree a "multi-level distribution company" as defined by Massachusetts General Laws Chapter 93, Section 69(a);

h.  did the standard TelexFree Pre-March 9 Contract contain promises to pay merely for the recruitment of new members in violation of Massachusetts General Laws Chapter 93, Section 69(a);

i.  did the standard TelexFree Pre-March 9 Contract contain offers to pay a "finder's fee, bonus, refund, override, commission, cross-commission, dividend or other consideration" to Participants in the TelexFree Program in violation of Massachusetts General Laws Chapter 93, Section 69(a);

j.  did the TelexFree Program offer its Members payment without requiring them to engage in any "bona fide and essential supervisory, distributive, selling or soliciting" nor exercise any "judgment," "skill," or "control over the operation in

violation of Massachusetts General Laws Chapter 93, Section 69(a);

k.  did Defendant have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

l.  when did Defendant have actual knowledge of TelexFree's suspicious, tortious or unlawful activities;

m.  whether Defendant aided and abetted TelexFree's Pyramid Scheme;

n.  whether TelexFree violated M.G.L. c. 93A;

o.  whether Massachusetts' Blue Sky Laws will apply to the claims of the Putative Class;

p.  whether TelexFree violated M.G.L. c. 110A, § 410 - Massachusetts' Blue Sky Laws;

whether certain parties and MDL Defendants used and employed manipulative and deceptive devices and contrivances in violation of M.G.L. c. 110A, § 410; used means and instrumentalities, directly and indirectly, for the purchase and sale of unregistered securities; and used and employed manipulative and deceptive devices and contrivances in violation of the Massachusetts Uniform Securities Act, M.G.L. c. 110A, § 410(b) and M.G.L. c. 93A; or other applicable laws.

q.  whether TelexFree mailed fraudulent and inaccurate 1099 (Miscellaneous Income) forms to investors;

r.  whether the 1099 (Miscellaneous Income) forms should be declared void as a matter of law;

s.  whether Defendant's conduct violated any applicable Massachusetts and/or

Florida laws; and

t.    whether Plaintiffs and the Class are entitled to damages, civil penalties, punitive

damages, and/or injunctive relief.

399.    Plaintiffs' claims are typical of those of other Class members because Plaintiffs

were defrauded by Defendant's and MDL Defendants' common Scheme.

400.    Plaintiffs will fairly and accurately represent the interests of the Class.

401.    The prosecution of separate actions by individual members of the Class would

create a risk of inconsistent or varying adjudications regarding individual members of the Class,

which would establish incompatible standards of conduct for Defendant and would lead to

repetitive adjudication of common questions of law and fact.

402.    Class treatment is superior to any other method for adjudicating the controversy.

Plaintiffs know of no difficulty likely to be encountered in the management of this litigation that

would preclude its maintenance as a class action under Rule 23(b)(3).

403.    Damages for any individual class member likely cannot justify the cost of

individual litigation, so that absent class treatment, the Defendants' violations of law inflicting

substantial damages in the aggregate would go un-remedied without certification of the Class.

404.    Defendants have acted or refused to act on grounds that apply to the Class, as

alleged above, and certification is proper under Rule 23(b)(2).

## V.    FRAUDULENT CONCEALMENT

405.    Throughout the Class Period, Defendant and MDL Defendants affirmatively and

fraudulently concealed their unlawful conduct from Plaintiffs and the Class.

406.    Plaintiffs and the members of the Class did not discover and could not have

discovered through the exercise of reasonable diligence that MDL Defendants were violating the

laws as alleged herein until TelexFree claimed bankruptcy in April 2014 and could not through the exercise of reasonable diligence discovery that Defendant Montalvo was complicit in those violations until they received sufficient information to discover claims against Defendant Montalvo, at the earliest with the affidavit of Joseph Craft dated January 22, 2020 and the eventual review of documents received in October 2019.   Nor could Plaintiffs and the members of the Class have discovered the violations earlier than that time because Defendants concealed from Plaintiffs and the Class the nature of their unlawful conduct and acts in furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection.

407.    As a result of Defendants' fraudulent concealment of their actions, Plaintiffs and the Class assert the tolling of an applicable statute of limitations affecting the rights of action of Plaintiffs and Class members.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### TORTIOUS AIDING AND ABETTING FRAUD

408.    Plaintiffs incorporate by reference all allegations in all previous paragraphs, as though fully set forth here.

409.    Defendant Montalvo provided substantial assistance or encouragement to TelexFree the other MDL Defendants and Third Parties in committing fraud and the primary causes of action alleged herein and as set forth in Attachment 1 and did so with unlawful intent and knowledge that such parties were perpetuating an illegal and fraudulent Pyramid Scheme yet continuing to substantially assist or encourage.

410.    Defendant rendered this substantial assistance despite knowledge that TelexFree's operations constituted an unlawful, unfair, deceptive, and unsustainable Pyramid Scheme and financial fraud.

110

411.    Such substantial assistance rendered by Defendant despite knowledge of the illegal nature of TelexFree's operations, is detailed above and includes, but is not limited to:

      a.   providing banking, investment and asset management services for TelexFree and its management;

      b.   continuing to provide financial services following its undisputed knowledge of the fraudulent nature of TelexFree and its principles and agents'

      c.   processing payments for transfers of funds which deepened TelexFree's insolvency; and

      d.   providing letters of reference and support for TelexFree

412.    Each and every action taken by the Defendant enumerated above as substantial assistance is explicitly incorporated by reference.

413.    By each of the actions participating in the Pyramid Scheme, as alleged above, Defendant aided and abetted the commission of the causes of action alleged herein.

414.    As a direct and proximate result of TelexFree's illegal Pyramid Scheme and all the activities performed in connection therewith, to which Defendant provided substantial assistance, Plaintiffs and the Putative Class sustained damages and losses and demand to be made whole.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as follows:

1.  The Court determine that this action be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiffs as Class Representatives and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to

the Class;

2. The unlawful conduct alleged herein be adjudged and decreed an unlawful Pyramid Scheme in violation of Massachusetts General Laws Chapter 93, § 69 and Chapter 93A, §§ 2 and 11 and/or relevant Florida law including and the contracts with TelexFree and related entities be declared void and that any tax liability against them for alleged income they never received be declared void;

3. Plaintiffs and the members of the Class recover damages, as provided by law, to the maximum extent allowed under the law, including, without limitations, multiple damages, against Defendants;

4. Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law;

5. Defendant, his affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on his behalf or in concert with him, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein, or from entering into, adopting, or following any practice, plan, program, or device having a similar purpose or effect;

6. Plaintiffs and the members of the Class be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this complaint; and

7. Plaintiffs request that this Court issue Summonses for service on Michael Montalvo;

8. Plaintiffs and the members of the Class be granted such other and further relief as the case may require and the Court may deem just and proper.

112

## VI.     DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class demand a jury trial of their claims to the extent

authorized by law.

Respectfully submitted,

Adriana Contartese, Esq.
Florida Bar# 0089634
Law Office Of Adriana Contartese
OCN Document Prep Suite 926
19W Flagler Street
Miami, FL 3313 0
617-268-3557
Adriana911@juno.com